The opinion of the court was delivered by Biles, J.:
*402 In this capital murder case, a jury convicted and sentenced to death Justin Eugene Thurber for the January 2007 abduction and murder of J.S., a 19-year-old Cowley County Community College student. On direct appeal, Thurber claims numerous errors during his trial's guilt and penalty phases. See K.S.A. 21-4624 (requiring a jury to first decide a defendant's guilt before reconvening to determine whether to impose the death penalty). We affirm Thurber's capital murder and aggravated kidnapping convictions because we discern no reversible error during the trial's guilt phase.
As to Thurber's death sentence, a threshold matter must be resolved before we can go further. Thurber claims evidence from his 2009 penalty-phase proceedings demonstrated he was intellectually disabled and the district court erred when it found there was insufficient reason to believe that was true. Executing a person with an intellectual disability is prohibited. See Atkins v. Virginia , 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed. 2d 335 (2002) ; see also K.S.A. 2016 Supp. 21-6622(f) (district court cannot impose death sentence on a capital defendant whom the court determines to be intellectually disabled). Thurber also challenges the constitutionality of our statutes defining intellectual disability as they existed at the time of his crimes and as they exist now.
Our problem on appeal is identifying the law to apply to resolve these questions because that law changed after Thurber's trial. The United State Supreme Court twice expanded Eighth Amendment requirements for making intellectual disability determinations in death penalty cases. See Moore v. Texas , 581 U.S. ----, 137 S.Ct. 1039, 1044, 1053, 197 L.Ed. 2d 416 (2017) (states cannot restrict an individual's qualification as intellectually disabled by using outdated medical standards; these adjudications should be informed by the medical community's current consensus reflecting its improved understanding over time); Hall v. Florida , 572 U.S. ----, 134 S.Ct. 1986, 2001, 188 L.Ed. 2d 1007 (2014) (When defendant's IQ test score falls within the test's acknowledged and inherent margin of error, defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.).
Adding to this conundrum, the 2016 Legislature amended 76-12b01(i), expanding the criteria for demonstrating intellectual disability by allowing evidentiary "means in addition to standardized intellectual testing." The Legislature also directed that this change "shall be construed and applied retroactively ." (Emphasis added.) See L. 2016, ch. 108, § 1. These revisions appear to reflect legislative intent to comply with the United States Supreme Court's 2014 Hall decision by altering a key definition previously used by our Kansas courts for intellectual disability determinations. See K.S.A. 2016 Supp. 21-6622(h).
Because new rules for conducting criminal prosecutions typically apply to cases pending on direct review, such as Thurber's, we have determined the best interests of justice require remanding this limited question on intellectual disability to the district court for further proceedings. We retain jurisdiction over the remaining penalty-phase issues pending notification from the district court and the parties about the outcome on remand.
FACTUAL AND PROCEDURAL BACKGROUND
On Friday, January 5, 2007, following a late morning practice with her Cowley Community College Tigerette dance team, J.S. was reported missing. As police searched the Arkansas City area, suspicion quickly focused on Thurber.
That evening, a police officer saw Thurber's car parked near his parents' house. Thurber's father invited the officer inside to speak with Thurber. When asked about his whereabouts, Thurber said he drove his car to Winfield to meet a friend earlier that day; once there he and his friend met two people his friend knew, but whom Thurber did not know. He said the four drove around rural areas in a car belonging to one of the friend's friends until the car got stuck on a dirt road near Cedar Vale. Thurber said he started walking alone toward Arkansas City. He *403 eventually called his father, who picked him up. Thurber's father confirmed getting Thurber, who was wet and muddy, a little over a mile west from Cowley County State Fishing Lake. Thurber told the officer some friends drove his car back from Winfield. After getting the car, he said, he picked up his paycheck at Subway, where he worked.
That same evening, officers spoke with Alexis Swartzell, who recently ended a three-year relationship with Thurber. She told officers Thurber often took her to the Kaw Wildlife Area, southeast of Arkansas City, and she pointed out places she and Thurber would visit.
On Saturday, January 6, 2007, Detective Eric Mata arrested Thurber on a bond revocation and suspicion of criminal trespass because the investigation into J.S.'s disappearance showed Thurber had been on the college campus, where the detective believed Thurber was not supposed to be. Thurber told Mata he wanted to speak with his attorney.
Also that evening, officers searched Thurber's parents' house. Officers collected the shoes Thurber wore when his father picked him up the day before. The shoes were wet and drying on a towel. Thurber's father told police he helped Thurber clean mud off the shoes.
By Sunday, January 7, 2007, searchers trained in identifying human activity in rough country looked for J.S. near the Kaw Wildlife Area. They found matching impressions of Thurber's shoes. They also saw tracks nearby that appeared to be impressions left by flip-flop sandals. As evening approached, the search stopped for the day.
On the way home, some searchers drove past Cowley County State Fishing Lake and decided to stop because they heard Thurber was wet when his father picked him up. They discovered a muddy tire track, muddy shoeprints near a public restroom, mail addressed to J.S.'s parents in a chemical toilet, dance shoes in another toilet, and a flip-flop sandal. Investigators later retrieved cutoff sweat shorts, a wallet containing J.S.'s driver's license and social security card, her black leotard, a Tigerette jacket with J.S.'s first name on the front, a vehicle floor mat, and a car seat cushion. The sandal matched the impressions found at the Kaw Wildlife Area. Searchers spent the next two days around Cowley County State Fishing Lake and the Kaw Wildlife Area.
On Tuesday, January 9, 2007, divers located J.S.'s submerged car in the lake. Officers recovered another flip-flop sandal matching the earlier one. At the Kaw Wildlife Area, searchers found J.S.'s naked body in a wood pile.
The State charged Thurber with two alternative counts of capital murder: one alleging J.S. was the victim of attempted rape and the second alleging she was the victim of aggravated criminal sodomy. The State also charged Thurber with one count of aggravated kidnapping and filed a notice of intent to seek the death penalty based on a single aggravating circumstance-the murder was committed in an especially heinous, atrocious, or cruel manner. See K.S.A. 21-4624(a) ; K.S.A. 21-4625(6).
Trial: guilt-phase proceedings
A little more than two years later, a jury convicted Thurber of capital murder based on combined theories of attempted rape and aggravated criminal sodomy. The jury also convicted him of aggravated kidnapping. It is necessary to detail the prosecution's case to explain how we resolve the issues.
The State presented evidence of Thurber's and J.S.'s movements on the day J.S. disappeared. The State placed Thurber at Cowley County Community College that morning. Photographs and security camera footage showed Thurber's light blue Cadillac at various campus locations with the car entering and exiting campus parking lots multiple times between 10:18 a.m. and 11:48 a.m. Two Tigerette dance team members testified they saw Thurber in his vehicle near campus that morning. One noticed him as she arrived for practice at 9:50 a.m., and the other as she left practice at 11:50 a.m.
Several witnesses testified they saw J.S.'s car that afternoon. Kari Morris, J.S.'s friend, noticed J.S. sitting in the passenger seat as their two vehicles passed each other in Arkansas *404 City shortly after noon. Morris testified the person driving J.S.'s car appeared to be a large male. She called J.S.'s cell phone but did not get an answer. She said J.S.'s car appeared to be heading east out of town. Two other women testified they saw a car like J.S.'s vehicle while driving on a dirt road south of Arkansas City around 3 p.m. One testified Thurber was the driver and identified him in court.
Cell phone tower data indicated Thurber's and J.S.'s cell phones were east of Arkansas City that afternoon. And some of the individuals who Thurber said he was with that day testified they were not with him.
The State presented DNA evidence connecting Thurber to J.S.'s car and her body. Terry Melton, a director of a forensic DNA testing laboratory, testified she ran mitochondrial DNA tests on a hair found on the driver's seat of J.S.'s car. Melton said Thurber and his maternal relatives could not be excluded as donors, although 99.77 percent of the population could be excluded. Lance Antel, a KBI forensic biologist, analyzed several DNA samples collected from J.S.'s body. Antel could not exclude Thurber as a possible contributor for a partial mixture DNA profile collected from J.S.'s right breast. But because the profile only identified one locus, that profile would appear in one in 21 Caucasians. Gina Pineda, a private DNA testing company employee, testified she conducted Y-STR analysis on several samples. Results from the right breast swab yielded a "[v]ery weak" partial profile with two markers. Pineda testified Thurber could not be excluded as a contributor, but cautioned one in four males would have the same two markers. Barbara Leal, another private DNA testing company employee, testified she performed Y-STR testing on samples collected from J.S.'s right bicep and right rib cage. Thurber could not be excluded as a possible contributor. Leal testified she combined samples from J.S.'s right hand and fingernail clippings. Thurber could not be excluded as a contributor, although 99 percent of the population could be excluded.
Steve Koch, a KBI forensic scientist, testified he took photographs and casts of "footwear impressions" at the Kaw Wildlife Area. They were consistent with those made by Thurber's shoes and J.S.'s flip-flop sandals.
Several women testified about Thurber's behavior toward them. One, a dance team member, found a note signed by Thurber and a rose on her car windshield. A second team member described being followed one night by a light blue car and then three days later seeing Thurber in that vehicle on campus near where dance practice occurred. A third woman, who worked at Subway with Thurber, described how he frightened her by driving by the store late one night as she was closing. The Subway store manager testified Thurber left a card and a rose on her vehicle. She said he also approached her at 6:30 a.m. when she arrived to open the store and asked for a ride claiming his car had broken down. Swartzell testified about consensual sexual encounters, including Thurber occasionally choking her during sex by tightening and relaxing his grip around her neck, sodomizing her with a small plastic item, and once having sex with her in the Kaw Wildlife Area. Her testimony suggested similarities with medical testimony about J.S.'s injuries and cause of death.
Thurber did not put on any evidence in his defense.
Trial: penalty-phase proceedings
For the penalty phase, the State relied on its guilt-phase evidence to prove the crime was committed in an especially heinous, atrocious, or cruel manner. The defense called psychologist Robert Barnett, who met with Thurber multiple times, conducted a psychological evaluation, and reviewed Thurber's medical records. Other defense witnesses testified Thurber was bullied as a child. Thurber's immediate family testified they would continue to have a relationship with him if he was sentenced to life in prison. The State's rebuttal witness testified he saw Thurber at the Arkansas City VFW the day after J.S.'s disappearance and described Thurber as "[h]appy, easy going."
The jury returned a verdict for death, unanimously agreeing the State proved its aggravating circumstance beyond a reasonable doubt and that the aggravating circumstance *405 was not outweighed by any mitigating circumstances found to exist.
The day before sentencing, Thurber filed a motion to determine whether he was intellectually disabled under K.S.A. 21-4623. The district court considered that motion at the sentencing hearing. The defense relied on its penalty-phase mitigation evidence, which it claimed established Thurber's "low mental functioning." The State challenged the request as untimely. It also argued the record failed to demonstrate Thurber was intellectually disabled. The court overlooked any procedural deficiency and denied the motion on its merits, concluding there was insufficient reason to believe Thurber was intellectually disabled.
Turning to sentencing, the district court found the evidence supported the jury's determination and sentenced Thurber to death. It also sentenced him to 176 months' imprisonment for the aggravated kidnapping to run consecutive to the death sentence.
This is Thurber's direct appeal. Our review is automatic. K.S.A. 2016 Supp. 21-6619(a). For convenience and clarity, the issues are numbered as they were listed in Thurber's Supplemental Brief and Amended Supplemental Brief. Additional facts will be detailed as we discuss the claimed errors.
GUILT PHASE
1. Thurber's Invocation of His Right to Counsel
Thurber argues the district court erred in admitting a recorded police interview because it found he reinitiated contact with law enforcement after previously invoking his right to an attorney. Notably, Thurber does not claim the recorded interview adversely affected the jury's guilt determination. Instead, he argues the statement prejudiced him in the penalty phase by undercutting a mitigating circumstance that he felt remorse for the murder. We address the merits now and consider the prejudicial effect of any error on the guilt phase. If necessary, we will return to this prejudicial effect question in the penalty-phase context after remand.
The State concedes Thurber was in custody after his arrest and made several requests for an attorney before giving the recorded statement. The State claims Thurber voluntarily reinitiated contact with law enforcement during an early morning drive with a sheriff's deputy and then validly waived his rights immediately prior to giving the statement. The district court erred by admitting this statement.
Thurber did not reinitiate conversation about the case after invoking his right to counsel. Under our well-established caselaw, once the right to an attorney is invoked, an individual is not subject to further questioning until counsel is made available "unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona , 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed. 2d 378 (1981) ; see also State v. Walker , 276 Kan. 939, 946, 80 P.3d 1132 (2003) ("Questioning can be resumed only after a lawyer has been made available or the suspect reinitiates conversation."). With respect to reinitiation, an individual who has invoked the right to counsel "must evince 'a willingness and a desire for a generalized discussion about the investigation ,' " and the individual's statement must " 'not merely [be] a necessary inquiry arising out of the incidents of the custodial relationship.' " (Emphasis added.) Walker , 276 Kan. at 947, 80 P.3d 1132 (quoting Oregon v. Bradshaw , 462 U.S. 1039, 1045-46, 103 S.Ct. 2830, 77 L.Ed. 2d 405 [1983] ).
In other words, a valid waiver of a previously asserted right "cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation even if he has been advised of his rights ." (Emphasis added.) Edwards , 451 U.S. at 484, 101 S.Ct. 1880.
1.1 Additional Facts
When Detective Mata arrested Thurber at about 9:45 p.m., Saturday, January 6, 2007, Mata did not read Thurber his Miranda rights. Nevertheless, Thurber told Mata he wanted to speak to his attorney. There was no questioning at this time.
After arriving at the Arkansas City Police Department, Thurber told a law enforcement officer he wanted to speak with Mata, who *406 shortly thereafter met him in a holding room. Thurber said he wanted to "get this over with." Thurber insisted on being transported to the county jail, but then shifted gears and told Mata he would talk if his attorney came to the police station. Mata asked Thurber for the attorney's phone number. Thurber said the number was at his house, but suggested the attorney was probably at a local bar and Mata could reach her there.
Instead of trying to connect Thurber with his attorney, Mata mentioned Thurber's recent break up with Swartzell. Mata also talked about Thurber's bond revocation. Mata then asked Thurber where he was on January 5 between 11 a.m. and 11 p.m. Thurber again said he wanted his attorney present. Mata responded, "[I]t's probably not a good idea that she comes down here" if she was at a bar drinking. Thurber said he wanted his father with him before he would talk and also requested his mother be allowed in the room. Mata said Thurber would have to waive his rights to be silent and to an attorney if his parents were there. Thurber agreed.
When his parents arrived, Thurber spoke with them privately. Afterward, Mata asked if Thurber was ready to give a statement. Thurber replied he was not talking and said again he would not answer questions without his attorney. Mata became agitated, told Thurber he was "not going to be playing these games," and began photographing Thurber. Then Mata and Thurber discussed a previous criminal case. Thurber asked for a promise he would not be charged for stalking if he gave a statement about his whereabouts the previous day. Mata said he could not make promises. Up to this point, neither Mata nor any other law enforcement officer had read Thurber his Miranda rights.
Around 11 p.m., KBI special agent David Falletti joined the questioning. Falletti gave Thurber a written Miranda rights waiver and began reciting it. But before the agent could finish, Thurber interrupted, listed off his rights, and said he knew them. Thurber completed and signed the waiver.
Falletti said he understood Thurber had previously requested an attorney, but "recontacted us and asked for Detective Mata." Thurber agreed. Falletti confirmed, "[W]e're allowed to talk to you now because you came to us." Thurber agreed, noting he could stop answering questions any time. He then told Mata and Falletti about his whereabouts the day before.
Thurber said he woke up at 11 a.m. and drove around for a short period before stopping at a gas station. He then went looking for the biological father of Swartzell's daughter. Around this time, he was pulled over for a traffic violation. At about noon, he parked near Subway and waited for Travis Alberding to bring him a computer and shoes. Travis arrived 20 minutes later, and the pair left in Travis' car for Winfield. They intended to meet an individual named Matt, but could not find him. They then drove to Dexter, but the car got stuck on a field access road. The two got into a fight, and Thurber decided to walk home alone. He walked for about six hours before calling his father, who picked him up. When he got home, Thurber went to Subway to pick up his paycheck.
Mata, Falletti, and another officer drove Thurber out east of town so he could show them where he said he was. Thurber could not locate where he said the car had gotten stuck.
After returning to the police station, Thurber volunteered to take a polygraph test. The interview ended around 3:30 a.m. on Sunday, January 7. Mata left the police station. At approximately 3:50 a.m., Sheriff's Deputy Joe Owen drove Thurber to the Cowley County jail. On the way, Thurber told Owen he wanted to talk again to Mata or Falletti, but he also wanted his relative, Chad Monroe, who was employed with the Cowley County Sheriff's office, included in that conversation.
When Thurber's request was relayed to the Arkansas City Police Department, Lieutenant Jeff Moore called him at 4:40 a.m. at the jail. Thurber said he wanted police to investigate Travis, who Thurber claimed stole property from him. Moore decided not to disturb Mata about this. Instead, Moore told Mata later that Sunday morning about Thurber asking to speak with him. When Mata met with Thurber soon after, Mata asked him what he wanted to talk about.
*407 Mata testified Thurber explained he wanted to talk about Travis.
At 11 a.m., Sunday, January 7, Mata and Falletti took Thurber back to the Arkansas City police station to meet KBI special agent Rick Atteberry, who provided Thurber another Miranda rights waiver form. Atteberry read the form to Thurber, and then Thurber read it to himself. The form set out Thurber's right to remain silent, right to an attorney, and right to have an attorney present during questioning. Thurber signed the form. Atteberry then recorded an interview during which Thurber described his whereabouts consistently with the version he previously told Mata and Falletti.
The interview and polygraph lasted about three hours. Afterwards, Thurber requested his attorney. He said he did not want to talk to Atteberry anymore but did want to speak with Mata. Officers got Thurber's attorney on the phone, and Thurber spoke with her. After that, the only discussion between Thurber and Mata that day was small talk unrelated to the investigation.
Before trial, the State moved for an admissibility determination for the recorded Atteberry statement. The State argued Thurber reinitiated contact with law enforcement through Deputy Owen after his earlier invocation of rights and then waived those rights just before giving the Atteberry statement. The district court ruled the statement admissible.
The court determined Thurber reinitiated contact during the early morning car ride with Owen. The court noted nearly eight hours elapsed before Thurber gave Atteberry his statement. The court observed Atteberry was not involved in earlier questioning and that Thurber did not request an attorney again between the time he talked with Owen and giving the Atteberry statement. The court further noted Thurber was familiar with the criminal justice system, was previously advised of his rights, interrupted Falletti when those rights were explained to express his understanding of them, was not pressured or coerced into giving the Atteberry statement, and was not under the influence of alcohol or drugs. The district court held the statement was "knowingly and voluntarily made."
At trial, the State played the Atteberry statement over defense objection. The State also called Travis, who testified he was not with Thurber the day J.S. disappeared.
1.2 Standard of Review
An appellate court reviews a district court's decision to admit a defendant's statement into evidence using a bifurcated standard. State v. Salary , 301 Kan. 586, 602, 343 P.3d 1165 (2015).
" 'Without reweighing the evidence, the district court's findings are reviewed to determine whether they are supported by substantial competent evidence. The ultimate legal conclusion regarding the suppression of evidence is then reviewed using a de novo standard.' State v. Bridges , 297 Kan. 989, 1001-02, 306 P.3d 244 (2013). When the facts material to a trial court's decision on a motion to admit or suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court exercises unlimited review. 297 Kan. at 1002 [306 P.3d 244]." Salary , 301 Kan. at 602-03, 343 P.3d 1165.
In Thurber's case the material facts are undisputed, so we employ de novo review to decide whether the Atteberry statement was admissible. The State bears the burden of establishing by a preponderance of the evidence that a Miranda waiver was knowing, intelligent, and voluntary, and that any post-waiver statement was made voluntarily. See State v. Bridges , 297 Kan. 989, 1004, 306 P.3d 244 (2013) (citing Colorado v. Connelly , 479 U.S. 157, 168-69, 107 S.Ct. 515, 93 L.Ed. 2d 473 [1986] ). The same is true for the State's claim that Thurber reinitiated contact. See Walker , 276 Kan. at 947, 80 P.3d 1132 ("The prosecution has the burden to show that subsequent events indicated a waiver of a previously asserted right and that the waiver was knowing, voluntary, and intelligent under the totality of the circumstances.").
*408 1.3 Analysis
In Miranda v. Arizona , 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966), the United States Supreme Court adopted procedural safeguards to protect individuals from the "inherent compulsions of the interrogation process." Before an individual in custody is subjected to questioning, that individual must be "adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." 384 U.S. at 467, 86 S.Ct. 1602. This requires law enforcement to inform the individual before questioning about the right to remain silent and the right to an attorney. The individual must also be warned that "anything said can and will be used against the individual in court." 384 U.S. at 469, 86 S.Ct. 1602. Any waiver of these rights must be knowingly and intelligently made. 384 U.S. at 475, 86 S.Ct. 1602.
The State does not dispute that Thurber clearly invoked his right to counsel when first arrested and other times while in custody. The problem centers on how our caselaw treats what happened next-when the State claims Thurber reinitiated contact with law enforcement and then later waived his previously invoked right to counsel.
To determine whether an individual waived an asserted right to counsel, a court must decide if the accused reinitiated discussions with police and knowingly and intelligently waived the previously asserted right. Walker , 276 Kan. at 946-47, 80 P.3d 1132 (citing Smith v. Illinois , 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed. 2d 488 [1984] ). Absent this, statements obtained by law enforcement from an individual who remained in custody following invocation of the right to counsel must be suppressed. Edwards , 451 U.S. at 486-87, 101 S.Ct. 1880.
No one disputes Thurber unambiguously invoked his right to counsel; indeed, he invoked it on several occasions. Therefore, the Atteberry statement's admissibility turns on whether: (1) Thurber reinitiated further discussions while riding with Deputy Owen; and, (2) if so, whether he knowingly and intelligently waived his previously asserted right to counsel. See Bradshaw , 462 U.S. at 1044-46, 103 S.Ct. 2830 (reinitiation of conversation by accused does not itself amount to waiver of previously invoked right to counsel). These are separate and distinct inquiries. 462 U.S. at 1045, 103 S.Ct. 2830. Our review of the district court's admissibility determination begins and ends with the first inquiry.
In its reinitiation analysis, the district court did not explicitly consider-as it should have-whether Thurber's statements to Owen expressed a desire for a discussion about the investigation as our caselaw requires, as opposed to some incidental topic. See Walker , 276 Kan. at 947, 80 P.3d 1132. The facts are undisputed. During the drive back to jail, Thurber told Owen he wanted to talk to Mata or Falletti and wanted his relative Monroe to participate in that conversation. This alone did not exhibit a "willingness and a desire for a generalized discussion about the investigation" as required by Bradshaw , 462 U.S. at 1045-46, 103 S.Ct. 2830, because the subject matter at this point was unknown. Thurber indicated only that he wanted to conditionally speak with either detective, but nothing was known about what he wanted to talk about. We must look more deeply into the circumstances.
Once advised Thurber wanted to speak again with law enforcement, Lieutenant Moore properly asked Thurber what he wanted to talk about. Cf. State v. Walker , 304 Kan. 441, 456, 372 P.3d 1147 (2016) (interviewing officer may ask clarifying questions regarding ambiguous invocations). Moore testified Thurber "wanted to tell me about someone that ha[d] stolen property from him." With this clarification, Thurber's request is now expressly understood to be unrelated to J.S.'s disappearance. And we note Moore appreciated this at the time because he thought the subject matter was so inconsequential the detectives did not need to be disturbed about it. Just as telling, when Mata returned to take Thurber to Atteberry for the recorded interview that Sunday morning, Mata confirmed Thurber's earlier request to speak with him was something about Travis, but he could not recall exactly what.
Under Edwards and Bradshaw , law enforcement was not free to reopen the dialogue with Thurber about the criminal investigation *409 or take the next step to attempt a waiver of previously invoked rights-even if Thurber did waive those rights at Atteberry's prompting. See Bradshaw , 462 U.S. at 1045, 103 S.Ct. 2830. As this court has previously explained, "The rules regarding custodial interrogations and an accused's constitutional rights are well established." Walker , 276 Kan. at 944, 80 P.3d 1132.
Once the right to counsel is invoked, courts impose a "relatively rigid requirement" that questioning must stop. Fare v. Michael C. , 442 U.S. 707, 718, 99 S.Ct. 2560, 61 L.Ed. 2d 197 (1979). Questioning can be resumed only after a lawyer is made available or the individual who previously invoked the right reinitiates the conversation about the investigation's subject matter. Edwards , 451 U.S. at 482, 484-85, 101 S.Ct. 1880. This so-called " Edwards rule" is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." Michigan v. Harvey , 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed. 2d 293 (1990). The requirement that the individual's expression of reinitiation show a willingness and desire for more discussion about the investigation-rather than just making an unrelated inquiry about something else-operates as part of the Edwards safety net for Fifth Amendment rights. These rules must be followed even when a suspect's on-again, off-again banter sorely tests investigators' patience as it probably did in this instance.
The district court erred when it admitted Thurber's recorded statement to Atteberry. The court's conclusion that Thurber "[re]initiated the communication with [Owen]" failed to consider whether that contact showed a desire on Thurber's part to re-engage in dialogue with law enforcement about the investigation. And, as discussed, the facts demonstrate Thurber's request reflected his desire to talk about something else. Our inquiry must now turn to whether this error requires reversing Thurber's convictions.
As noted earlier, Thurber does not contend this error affected the jury's guilty verdict. Nevertheless, we address prejudice in the guilt phase for this improperly admitted evidence under our authority to review unassigned errors. K.S.A. 2016 Supp. 21-6619(b). That said, we conclude the error was harmless standing alone with respect to the jury's guilt determination.
The State offered the Atteberry statement in the guilt phase essentially to show Thurber lied concerning his whereabouts the day J.S. disappeared. It did this by calling Travis, who Thurber said he was with that day. Travis denied being with Thurber. But Thurber's lack of candor was established when the State discredited him in the same manner on a slightly different alibi Thurber provided the officer who interviewed him at his parents' home early in the investigation.
To the extent the Atteberry statement adversely affected Thurber's credibility, it was cumulative to other evidence properly admitted that did the same thing. We hold the error was harmless in the guilt phase.
2. Prosecutorial Error in the Guilt Phase
Thurber contends various comments by the prosecutor during voir dire, opening statement, and closing argument constitute reversible error. He argues the prosecutor: (1) provided the jury with an improper "imaginary script" during opening statement and closing argument; (2) improperly told the jury the prosecutor was personally responsible for the case and that the Attorney General had determined death was the appropriate sentence; and (3) incorrectly stated the law when the prosecutor claimed premeditation "[c]an be instantaneous." We agree some prosecutorial error occurred.
2.1 Additional Facts
The district court divided the potential jury pool into groups for separate questioning. The prosecutor told several panels, "Now, [it's] my burden ... to prove beyond a reasonable doubt that Mr. Thurber is guilty. Will you hold me to that burden?" (Emphasis added.) Later, in response to a panel member's statement that he would vote not guilty if the defense could convince him Thurber was innocent, the prosecutor said:
"I want to bring up something to all of you. Those two men right there, the defense attorneys, and Mr. Thurber, they don't *410 have to do a thing. You are looking right here at the man that has to do something in this case. Okay. They have no burden at all. I have the burden. Okay. I have the burden . I'm not saying they aren't going to do something. But they don't have to do a thing. Principle of law is that you can't shift the burden to the defense. I have the burden . You have to say-when you go back to the jury room, you have to say did [I] prove the case ." (Emphases added.)
During another panel, the prosecutor explained the presumption of innocence and burden of proof:
"Now, with that key principle, there is called the presumption of innocence. Okay. That means that a person is presumed innocent until I, the prosecutor, present evidence at trial to show that he's guilty beyond a reasonable doubt.
....
"So that is the first key thing. He doesn't-Mr. Thurber and his defense team, they can sit there just like right now, not say a thing. They don't have to, because it's my burden . It's my burden to prove beyond a reasonable doubt that he's guilty . They don't have to do a thing. It's my burden to prove beyond a reasonable doubt . That's the presumption of innocence. Okay. He's presumed innocent. And is an [sic ] until, in the eyes of the law, until found guilty." (Emphases added.)
During opening statement, the prosecutor said:
"First thing, defendant could not be excluded as a contributor of that DNA on [J.S.]'s right hand. Under the testing they do, they have 16 markers. The DNA on [J.S.]'s right hand, 16 markers matched the defendant's DNA.
"[J.S.]'s body was taken from the Kaw Wildlife area to Wichita for autopsy. Doctor Oeberst did an autopsy. [J.S.] was bruised from her head, on her head, on her arms, on her torso, lower back, buttocks, legs; bruised from head to toe.
"She had abrasions on her back that were consistent with being drug 30 feet. From the place where she was [dis]robed to the place where her body lay.
"She was struck so hard in the face that it snapped her face back (indicating) and lacerated an artery in her neck. And she was strangled. She was strangled. Repeatedly strangled. Repeatedly strangled of a tightening and relaxing, tightening, relaxing. She was struggling to get away. A man with big hands had his grip on her neck. Not only hands, but ligature consistent with [J.S.]'s leotard strap . And at the time that she would struggle and can get a little bit, she is gasping for air, gasping. And every time she did that, more oxygen went to her brain, allowed her to live longer. The strangulation, five to 12 minutes. Five to 12 minutes.
"Part of that examination also included the sexual assault. I'm going to take you back to the Kaw Wildlife area. [J.S.]'s body. She's been strangled by ligature, manually. Her artery snapped in the back of her neck. She's dying. Her heart is still beating. She's looking up at the gray sky. She's in an area that she does not know. Her heart is still beating. Defendant spreads her legs. Gets between her legs and gets a large stick. Gets a large stick. He grabs it and he jams it up her anal canal tearing, bruising, hemorrhage. Her heart is still beating, still pumping blood. He jams that stick up into her approximately two inches of length. But he's not done there.
"He next takes wood debris. He takes wood debris and stuffs it in her vaginal cavity. But he's not done yet. He's not done yet.
"In her last breath, before he gathers her clothes, before he heads out of that area, before he gets back in her car and takes it and dumps it in the lake, before he does that, he moves from ... between her legs up toward her face. And he gets leaves and grinds them up. He grinds them (indicating) in his hand. And he takes those leaves and he smashes them in each one of her ears. Smashing (indicating) them. Packs it in there. But he's not done yet. He's not done yet.
"[J.S.]'s suffering is ending. Her suffering is ending. But the suffering of others is just beginning. What he does, he grabs *411 more leaves, wood debris, and he opened [J.S.]'s mouth and he crams it full of wood debris and leaves. That's his last act on the body of [J.S.]" (Emphasis added.)
During closing argument, the prosecutor said the following:
"Mental anguish, uncertainty to her fate, terror. She's looking at that man right over there (indicating). A man that she did not know. And she was not certain of her fate.
"By 4:30 that afternoon, about this time, if you would take it from noon to 4:30, she'd been in that car. And now the car was arriving at the Kaw Wildlife area. That whole time; fate uncertain, the terror. 40 minutes into it, she gets a call from her mom. She can't take it. But she does try to call out. She pushes a number. Number is nobody home. That's the last call from that cell phone. It was powered down. It was powered down.
"4:30 they arrive at the Kaw wildlife area. Defendant gets her out of that vehicle and walks her down. Walks her down a trail of death.
"She is to his left. He is to the right. He's holding onto her right hand with his left. And he's taking her down the trail of death.
"When she gets to a point where she can't take it anymore, she either collapses or resists and he picks her up and he carries her. Carries her to the place where he drops her down. Beats her. Grabs her leotard[ ] and strangles her."
Defense counsel objected, claiming the argument mischaracterized the evidence and, with respect to the leotard, was unsupported by the evidence. The prosecutor argued he was drawing reasonable inferences. The district court told the jury to disregard any argument not fairly supported by the evidence.
Later, the prosecutor said:
"Why was the passenger side seat pulled out. What did Alexis say? Alexis said he was stimulated by resistance. You got to ask yourself why will he cut that passenger seat out? Because he got too stimulated. He got stimulated and it caused him to ejaculate."
Again, defense counsel objected and argued the prosecutor's closing remark mischaracterized the evidence and that there was no evidence to support the statement. As before, the prosecutor argued it was a reasonable inference. The district court reminded the jury to disregard statements not supported by the evidence.
The prosecutor returned to the burden of proof and his responsibility to meet that burden:
"I have the burden . That's what I told [you] from the very start. I want you to hold me to that burden . It's not his responsibility to prove he's not guilty. It's my responsibility. You're looking at the man right here (indicating) who was tapped on the shoulder about a year [a]go by the attorney general to take this case . Get a conviction and take it to sentencing. It's my job. Hold me responsible ." (Emphases added.)
Defense counsel objected and asserted, "It's the State's responsibility. It's not a personal thing to [the prosecutor]." The prosecutor replied, "I agree. It's [the] State's responsibility. I represent the State in this case." The district court stated, "With that explanation, continue."
With respect to premeditation, the transcript quotes the prosecutor as follows:
"What premeditation means is before the act of killing, before you kill you have had to have thought it over in your mind. And think it over in your mind. Thought out the matter beforehand doesn't mean it had to happen two hours ago, one hour ago. All it is, is before the act, I'm going to kill. I've thought over the matter beforehand. Can be instantaneous . It's just you got to have that thought in your mind before you kill. That's all that's required." (Emphasis added.)
2.2 Standard of Review
This court recently "jettisoned the term 'prosecutorial misconduct' in favor of the term 'prosecutorial error.' "
*412 State v. Kleypas , 305 Kan. 224, 315, 382 P.3d 373 (2016) ( Kleypas III ) (quoting State v. Sherman , 305 Kan. 88, Syl. ¶ 5, 378 P.3d 1060 [2016] ), cert. denied --- U.S. ----, 137 S.Ct. 1381, 197 L.Ed.2d 560 (2017). We also refined the analytical framework for considering prosecutorial error claims:
"In analyzing claims of prosecutorial error, appellate courts will employ a two-step process, first determining whether error occurred and, if it did, then determining whether prejudice resulted. 305 Kan. 88, Syl. ¶ 6 [378 P.3d 1060]. Under the first step, we will continue to analyze whether the prosecutor's statements 'fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial.' 305 Kan. 88, Syl. ¶ 7 [378 P.3d 1060]. At the second stage of the analysis, rather than step through the three Tosh factors, the prejudice analysis will focus on whether the error prejudiced the defendant's due process rights to a fair trial; if a due process violation occurs, prejudice will be assessed by applying the Chapman constitutional error standard. 305 Kan. 88, Syl. ¶ 8 [378 P.3d 1060]. Under that standard, '[p]rosecutorial error is harmless if the State proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e. , where there is no reasonable possibility that the error contributed to the verdict.' 305 Kan. 88, Syl. ¶ 8, [378 P.3d 1060]." Kleypas III , 305 Kan. at 315-16, 382 P.3d 373.
Because this appeal is not yet final, Sherman applies. The parties had the opportunity to discuss the Sherman framework at oral argument. See State v. Mitchell , 297 Kan. 118, Syl. ¶ 3, 298 P.3d 349 (2013) (change in law applies to cases pending on direct review and not yet final on date of appellate court decision).
2.3 Discussion
Thurber argues three categories of prosecutorial error: (1) providing the jury with an improper "imaginary script" during opening statement and closing argument; (2) improperly telling the jury the prosecutor was personally responsible and the Attorney General had determined death was the appropriate sentence; and (3) incorrectly stating the law when he claimed premeditation "[c]an be instantaneous." We discuss each in turn, although within the imaginary script analysis we address several alleged factual misstatements. And because we determine there were instances of prosecutorial error, we will need to consider if they require reversal individually or cumulatively.
2.3.1 Imaginary Script
With respect to closing arguments, this court recently explained:
"Prosecutors enjoy wide latitude in crafting closing arguments. See State v. Scott , 271 Kan. 103, 114, 21 P.3d 516 [2001] (citing State v. Miller , 268 Kan. 517, Syl. ¶ 4, 997 P.2d 90 [2000] ), cert. denied 534 U.S. 1047, 122 S.Ct. 630, 151 L.Ed.2d 550 (2001). This latitude allows a prosecutor to argue reasonable inferences that may be drawn from the admitted evidence, but it does not extend so far as to permit arguing facts that are not in evidence. State v. Tahah , 293 Kan. 267, 277, 262 P.3d 1045 (2011). Likewise, '[p]rosecutors are not allowed to make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law.' State v. Baker , 281 Kan. 997, 1016, 135 P.3d 1098 (2006). In short, a prosecutor's arguments must remain consistent with the evidence." State v. Pribble , 304 Kan. 824, 832, 375 P.3d 966 (2016).
Prosecutors step outside the wide latitude when employing an "imaginary script" to convey a victim's last moments because such a comment is unsupported by the evidence. State v. Robinson , 303 Kan. 11, 261, 363 P.3d 875 (2015), cert. denied --- U.S. ----, 137 S.Ct. 164, 196 L.Ed.2d 138 (2016). An evidentiary misstatement within an "imaginary script" may be amplified if the prosecutor uses this improper rhetorical device to arouse the jury's prejudice and passion. State v. Kleypas , 272 Kan. 894, Syl. ¶ 8, 40 P.3d 139 (2001) ( Kleypas I ) ("It is improper *413 for a prosecutor to create an 'imaginary script' in order to create and arouse the prejudice and passion of the sentencing jury."). Thurber argues the prosecutor used an imaginary script during opening statement and closing argument.
We first address Thurber's underlying assertion that the "purpose and limits of opening statements are to outline what evidence the prosecution expects to put on, not to argue its case." Based on that notion, Thurber contends the prosecutor's opening statement "was a dramatic narrative containing unsupportable references to the victim's thoughts and state of mind, and an unprovable theory of the sequence of events."
But this court has "refrained from putting too fine a point on the distinction between stating the facts and making forbidden argument" during opening statement. State v. Nguyen , 285 Kan. 418, 422, 172 P.3d 1165 (2007). And we have continued to indicate reasonable inferences can be drawn during opening statement. See, e.g., State v. Tahah , 302 Kan. 783, 788-89, 358 P.3d 819 (2015) (prosecutor's comment during opening statement that defendant was " 'going hunting' " for the victim was reasonable inference based on evidence eventually admitted at trial), cert. denied --- U.S. ----, 136 S.Ct. 1218, 194 L.Ed.2d 219 (2016) ; Kleypas I , 272 Kan. at 957, 40 P.3d 139.
Accordingly, our rubric for reviewing Thurber's prosecutorial error claims is the same whether the asserted claim arises in opening statement or closing argument. We distinguish them only for clarity.
2.3.1.1 Opening Statement
An "imaginary script" claim operates as a subcategory of the general prohibition against prosecutors arguing facts not in evidence. In many respects, Thurber's complaints are better framed in that light. For example, he argues there was no evidence of a tightening and relaxing grip associated with J.S.'s strangulation or that she gasped for air. He further asserts there was no evidence the strangulation lasted five to 12 minutes.
The State contends each statement was a reasonable inference from the evidence eventually admitted at trial. It notes the coroner testified J.S. was strangled and that bruising on her neck displayed "several discreet or outlying areas that could represent multiple applications of pressure." The coroner stated this bruising was consistent with repositioning the hands. The coroner explained a strangulation victim would struggle; and, if pressure was released, a victim could possibly gasp for air. The coroner also testified the time to kill by strangulation "varies," but estimated it would take "three to five minutes." And if pressure was released, the coroner testified, it would prolong that time. We agree with the State there was sufficient evidence to describe the tightening and relaxing of a grip with the additional inference the victim would gasp for air.
But the prosecutor misstated the evidence by asserting the strangulation could have lasted 12 minutes. The coroner said only that the time to kill someone could be extended by successively releasing pressure. There is nothing to support a 12-minute outside length of time.
Thurber also argues there was no evidence J.S. was looking up at a gray sky or did not know the area. The State argues the prosecutor's reference to looking up was reasonable because photographic evidence showed J.S.'s body lying on her back with her eyes open. But the State does not point to any evidence supporting an inference that J.S. was unfamiliar with the area, so that claim was error.
With respect to these two statements, Thurber contends the prosecutorial account was expressed as a first-person narration, "as if the prosecutor is at the scene standing in [J.S.'s] shoes." But Thurber is wrong. The statement was clearly third-person narration, and the prosecutor did not place himself in the victim's position.
Thurber next argues the prosecutor misstated the evidence eventually admitted when describing the wood and debris inserted into J.S.'s orifices. Thurber argues the sexual assault nurse examiner who performed the sexual assault examination at the *414 autopsy did not conclude whether these acts occurred prior to death. The State argues these statements were reasonable inferences from the evidence admitted. We agree with the State.
When asked in series about the wood and debris, the nurse testified J.S. sustained injuries before her death on her body where the wood and debris were found. The nurse further testified wood removed from J.S.'s anus "could be one of the contributing causes" of those injuries. Admittedly, some questions and answers were not completely clear, but overall the testimony supported the anticipatory description in opening about what the evidence would show. We hold the prosecutor was within the latitude.
Finally, Thurber argues the prosecutor never asked the coroner how long J.S. would have remained conscious after a blow to her head and strangulation. Thurber argues "[t]he silence in the record on this point was not a license for the prosecutor to state as proven fact-through dramatic narrative-that [J.S.] consciously suffered throughout the entire time." The State argues Thurber mischaracterizes what was said about J.S. remaining conscious throughout her attack. The State notes the prosecutor merely said J.S. was alive at the time and reference to J.S.'s suffering was "clearly a logical inference that could be drawn from the evidence" given her "extensive, brutal injuries."
The statements about J.S.'s suffering were within the latitude afforded during opening. Regardless of whether J.S. was conscious or unconscious for part of the attack, ample evidence that J.S. sustained injuries throughout fairly supported the statement that she "suffered" as that word is commonly understood. See, e.g., State v. Alger , 282 Kan. 297, 304, 306, 145 P.3d 12 (2006) (prosecutor stated during opening statement that two-year-old victim's " 'last memory will forever be that of the Defendant violently shaking the life out of her' "; prosecutor "danced on the line between mere recitation of expected evidence and forbidden argument" but did not step over it); Tahah , 302 Kan. at 788-89, 358 P.3d 819 (prosecutor's opening statement that defendant was " 'going hunting' " for victim was reasonable inference when evidence showed defendant sat in wait with rifle and shot victim through window in victim's house).
2.3.1.2 Closing Argument
Thurber generally contends the prosecutor used an imaginary script during closing argument to describe J.S.'s thoughts just before her murder. He argues there was no evidence he was holding J.S.'s hand; she collapsed or resisted; he forced her out of the car; or she was strangled with her own leotard. He further argues this "made-up narrative" of J.S.'s thoughts and last moments suggested conscious suffering when there was no evidence indicating it. Thurber specifically challenges the prosecutor's statement: "That whole time; fate uncertain, the terror." He contends this conveyed J.S.'s thoughts.
In Kleypas I , this court distinguished between an impermissible imaginary script and a permissible penalty-phase closing argument based on evidence and inferences about a victim's mental anguish:
"Prosecutors are allowed to introduce relevant evidence to show the victim's mental anguish and further to make arguments and inferences from the evidence that the victim suffered such mental anguish, where relevant. However, prosecutors cross the line when they make up an imaginary script that purports to tell the jury what the victim was feeling, where there is no evidence to support such a script. At that point, the imaginary script becomes evidence that was not admitted during trial." Kleypas I , 272 Kan. at 1114, 40 P.3d 139.
The prosecutorial comment that J.S. was uncertain about her fate and terrified the "whole time" was surely a reasonable inference from the evidence. See State v. Foster , 290 Kan. 696, 723-24, 233 P.3d 265 (2010) (prosecutor's description about the " 'extreme brutality ' " of acts and victim's " 'complete terrorization ' " within latitude). J.S. was abducted and held captive in her own car while Thurber, a large man, drove it around for hours in the countryside. She was eventually taken by him to a remote area where she was *415 attacked, beaten, and murdered. The prosecutor's statement did not speculate about her particular thoughts during this time. We hold the prosecutor did not use an imaginary script as Thurber contends.
Thurber next complains no evidence supported the remark that Thurber and J.S. walked hand-in-hand down the path at the Kaw Wildlife Area. But as the State correctly points out, it called a KBI forensic scientist who testified impressions along the path were consistent with footwear worn by Thurber and J.S. In addition, photographic evidence showed these impressions were side-by-side. Based on this, it was reasonable to infer Thurber and J.S. walked side-by-side down the path. The State also correctly notes Thurber could not be eliminated as a possible contributor to DNA collected from J.S.'s right hand, so it was a reasonable inference they walked hand-in-hand because J.S.'s footprints were left of Thurber's.
Similarly, the prosecutor's argument that J.S. collapsed or resisted so that Thurber picked her up and carried her was supported with evidence. Photographs showed J.S.'s footprints stopped halfway down the path and her body was found under a woodpile in a clearing farther down. It was reasonable to argue Thurber, who was much larger than J.S., picked her up and carried her to the clearing.
Thurber also complains the prosecutor claimed he "forced" J.S. out of the car, but that is incorrect. The prosecutor said, "Defendant gets her out of that vehicle and walks her down [the trail]." And that is a reasonable inference considering that Thurber abducted her, drove her around all afternoon, and then she was found murdered outside the vehicle down the trail.
But the statement Thurber strangled J.S. with her leotard crossed the line. To claim this, the State makes an inferential leap too great to be logical or reasonable. The only testimony linking the leotard to the crime is the coroner's bare testimony that "strangulation" was a cause of death. Nothing was said about the leotard. And since the evidence and argument focused on Thurber tightening and relaxing his grip on J.S.'s neck-not the use of a garrote-the prosecutor's assertion about the leotard was unsupported and error. See State v. King , 288 Kan. 333, 351, 204 P.3d 585 (2009) ("When a prosecutor argues facts that are not in evidence, this court has consistently found that 'the first prong of the prosecutorial [error] test is met.' ").
Finally, we consider a potential error from argued facts not supported by the evidence. We do so under our authority to notice unassigned errors. See K.S.A. 2016 Supp. 21-6619(b).
Thurber objected at trial to the prosecutor's theory about Thurber ejaculating on the passenger seat in J.S.'s car as unsupported by the evidence. In response, the prosecutor claimed it was a reasonable inference. Presumably, the prosecutor was relying on Swartzell's testimony that Thurber would become aroused if she resisted his sexual advances and linking that to the passenger seat being removed. But it takes wild speculation to connect these two evidentiary points to form a conclusion that Thurber ejaculated on the car seat. This statement was error.
2.3.2 Assuming Personal Responsibility
In Caldwell v. Mississippi , 472 U.S. 320, 328-29, 105 S.Ct. 2633, 86 L.Ed. 2d 231 (1985), the United States Supreme Court held "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Often, claims asserting this rule's violation involve prosecutors stating in penalty-phase proceedings that a jury's death sentence will be subject to review or correction by an appellate court if there is error. This court recently recognized, "The crux of a Caldwell violation is giving the jury misleading information which improperly minimizes its role in the death penalty process." State v. Cheever , 306 Kan. 760, 792, 402 P.3d 1126 (2017) (" '[W]e ... read Caldwell as "relevant only to certain types of comment-those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less *416 responsible than it should for the sentencing decision." ' ").
Thurber cites Caldwell and argues the statements that the prosecutor was personally responsible for proving Thurber's guilt beyond a reasonable doubt diminished the jury's sense of its responsibility. Thurber is wrong. We need not address the premise underlying this claim-that Caldwell extends to statements regarding the responsibility for determining guilt of a capital offense, as opposed to sentencing. The prosecutor asked the jury to hold him to his burden to prove the charges beyond a reasonable doubt. This does not suggest anyone other than the jury was responsible for making either the guilt or sentencing determination. These remarks were within the latitude afforded to prosecutors.
Thurber next argues the prosecutor improperly undermined the jury's responsibility by indicating the Attorney General had determined death was the appropriate sentence. This argument has two flaws. First, the prosecutor's comment did not do that. Second, even if the statement was so construed, the error would not be a Caldwell violation because it does not minimize the jury's responsibility for its decision. But the prosecutor's declaration that he was "tapped on the shoulder about a year [a]go" by the Attorney General was a comment outside the evidence and informed the jury about the prosecutor's personal pretrial involvement. See In re Care & Treatment of Foster , 280 Kan. 845, 858, 127 P.3d 277 (2006) (prosecutor's statement about her personal involvement in decision to institute involuntary commitment proceedings improper). It was error to do so.
2.3.3 Premeditation
Thurber contends the prosecutor misstated the law when he said premeditation "[c]an be instantaneous." The State argues the prosecutor said premeditation " 'can't' " be instantaneous, claiming the record has a transcription error. The State points to other places in the prosecutor's closing where he correctly stated the law of premeditation. We concede transcription error is plausible since the prosecutor frequently stated the correct law on premeditation.
But our problem as an appellate court is that the transcript constitutes part of the official record on appeal. "An official record imports verity and cannot be collaterally impeached." State v. Collier , 259 Kan. 346, Syl. ¶ 1, 913 P.2d 597 (1996). The State did nothing to correct the record. We must ignore the State's bald assertion and consider the official record as it exists.
This court has defined premeditation as follows:
" ' "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life." ' State v. Jones , 298 Kan. 324, 336, 311 P.3d 1125 (2013) (quoting State v. Martis , 277 Kan. 267, 301, 83 P.3d 1216 [2004] ). We have also recognized that ' "[p]remeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct, but it does not have to be present before a fight, quarrel, or struggle begins." ' State v. McBroom , 299 Kan. 731, 756, 325 P.3d 1174 (2014) (quoting State v. Gunby , 282 Kan. 39, Syl. ¶ 9, 144 P.3d 647 [2006] )." State v. Brownlee , 302 Kan. 491, 515, 354 P.3d 525 (2015).
The prosecutor's quoted account that premeditation "[c]an be instantaneous" is a misstatement of the law and constitutes error. See State v. Kettler , 299 Kan. 448, 475-76, 325 P.3d 1075 (2014) (error to inform jury premeditation can be instantaneous with homicidal act); State v. Holmes , 272 Kan. 491, 497-500, 33 P.3d 856 (2001) (prosecutor's statement that " 'premeditation can occur in an instant' " misstatement of law). We must include it in our error analysis.
2.4 Harmless Prosecutorial Error in the Guilt Phase
As the party benefitting from prosecutorial error, the State " 'bears the burden to establish beyond a reasonable doubt that *417 the error did not affect the defendant's substantial rights, i.e. , there is no reasonable possibility the error affected the verdict.' " State v. Killings , 301 Kan. 214, 239, 340 P.3d 1186 (2015) (quoting State v. Inkelaar , 293 Kan. 414, 431, 264 P.3d 81 [2011] ). The State argues "none of the statements, taken individually or collectively, could have possibly altered the outcome of the trial." With respect to the guilt-phase verdict, which is our sole focus here, we agree the prosecutorial errors are harmless-both individually and cumulatively.
The statements unsupported by the evidence were tangential to what the jury had to decide in the guilt phase. The speculation-relating to the amount of time the strangulation could have lasted; J.S.'s lack of familiarity with the area; the leotard's use in the strangulation; and Thurber's supposed ejaculation on the passenger seat of J.S.'s car-added nothing to the State's proof of capital murder or aggravated kidnapping. The prosecution's primary theory, as supported by the evidence, was that Thurber strangled J.S. with his hands. In fact, the prosecutor argued Thurber repeatedly tightened and relaxed his grip and repositioned his hands during the strangulation. The prosecutor's comment that Thurber strangled J.S. with her leotard was extraneous. An objection to the prosecutor's assertion about the passenger seat ended the journey down this speculative path, and ample evidence connected to J.S.'s body supported the State's attempted rape and criminal sodomy theories, independent of anything occurring in the car. Finally, the district court instructed the jury contemporaneously and more than once that it was not to consider statements unsupported by the evidence. These prosecutorial missteps were harmless beyond a reasonable doubt.
Similarly, the statement about the prosecutor's pretrial involvement was harmless beyond a reasonable doubt. It was an aside that, at most, indicated the Attorney General decided the case was "prosecution-worthy." Foster , 280 Kan. at 858, 127 P.3d 277 (acknowledging "juries may assume that anytime a criminal case is brought before them, some prosecutor has made a prior decision that the case is prosecution-worthy"). Notably, the statement was not made to invoke the office's prestige to support a particular verdict.
But the premeditation misstatement requires more cautious scrutiny because it was plainly wrong. When a case is close, misdirecting the jury about the proof necessary to find premeditation may require reversal. This is not such a case for two reasons. First, the comment was a single remark bookended by correct legal statements. The prosecutor correctly told the jury premeditation means to have "thought over the matter beforehand" before the misstatement. And the prosecutor promptly followed up with a correct statement that premeditation means "to have that thought in your mind before you kill." In addition, the prosecutor argued Thurber premeditated the killing well in advance of any lethal blow or blows. The prosecutor said:
"[D]uring that time that he's taking [J.S.] around for four and a half hours, what was he thinking? His actions show what he was thinking. His actions have taken her to the Kaw Wildlife area, dragging her body, strangling her, smacking her upside the head, sodomizing her, placing items in her genital area, in her mouth, her ... ears[ ]. Shows what he was thinking. Formed the intent to kill. Formed the intent to kill. Premeditation was there."
Second, there was considerable evidence supporting premeditation. It showed Thurber abducted J.S. from her home and drove her around before taking her to a remote location where he eventually killed her. The coroner testified she died from strangulation. See State v. Walker , 304 Kan. 441, 446, 372 P.3d 1147 (2016) ("We have noted many times that death by strangulation presents strong evidence of premeditation."). We agree with the State that "this was not a case where a misapprehension about the amount of time it takes to form premeditation could have had any effect." Moreover, the district court properly instructed the jury on premeditation.
Finally, in examining these prosecutorial errors in combination, we note they have no *418 relationship with each other such that their adverse effects would be greater than we have considered individually. In addition, the evidence against Thurber was strong when considered as a whole. We hold any cumulative impact from these prosecutorial errors was harmless beyond a reasonable doubt.
3. Multiple Acts
Thurber contends the State produced evidence of multiple acts that could constitute the crime of capital murder, so his conviction must be reversed because the jury was not instructed it must be unanimous as to the act upon which it based the capital conviction, i.e., attempted rape or aggravated criminal sodomy. The State notes its theories of attempted rape and aggravated criminal sodomy were alternative means of committing capital murder and not multiple acts, so jury unanimity was not required. We agree and hold this was not a multiple acts case.
3.1 Standard of Review
The parties disagree whether this case involves multiple acts or alternative means. Our standard of review on whether a case involves either is de novo. State v. Williams , 303 Kan. 750, 757, 368 P.3d 1065 (2016) ("[D]etermining whether a case involves alternative means is typically a matter of statutory construction, which is a question subject to unlimited review."); State v. Sprague , 303 Kan. 418, 422-23, 362 P.3d 828 (2015) (determining whether case involves multiple acts is question of law subject to unlimited review).
3.2 Analysis
We addressed this question recently in State v. Carr , 300 Kan. 1, 331 P.3d 544 (2014), rev'd and remanded 577 U.S. ----, 136 S.Ct. 633, 193 L.Ed. 2d 535 (2016). Defendant Reginald Carr argued he was entitled to a special unanimity jury instruction on alternative capital murder charges under K.S.A. 21-3439(a)(4) by alleging "jurors may not have understood that they needed to be unanimous on the sex crime underlying each capital murder charge." 300 Kan. at 166-67, 331 P.3d 544. The Carr court explained this argument "reflect[ed] a misunderstanding of the difference between a multiple acts issue and an alternative means issue." 300 Kan. at 167, 331 P.3d 544. The court clarified:
"At most, if more than one possible sex crime underlay each capital murder charge based on K.S.A. 21-3439(a)(4), that would set up the possibility of an alternative means issue, requiring the State to put on sufficient evidence of each sex crime as a means of committing the one capital murder charged. See State v. Brown , 295 Kan. 181, 196-97, 284 P.3d 977 (2012).
"If more than one possible sex crime underlay each capital murder charge based on K.S.A. 21-3439(a)(4), that would not set up a multiple acts issue requiring a special unanimity instruction or an election by the prosecution. See State v. Ultreras , 296 Kan. 828, 854-55, 295 P.3d 1020 (2013) ; State v. Voyles , 284 Kan. 239, Syl. ¶ 2, 160 P.3d 794 (2007). There was a single offense committed for each of the alternative K.S.A. 21-3439(a)(4) capital murders charged in this case, i.e. , the killing of each of the four victims of the quadruple homicide." Carr , 300 Kan. at 167, 331 P.3d 544.
Because J.S.'s murder was a single offense, the State did not present multiple acts evidence so no special unanimity instruction was required. Thurber's argument is without merit. And because the State concedes it charged alternative means of committing the crime, we further note Thurber does not contend the evidence was insufficient to support his conviction based on either attempted rape or aggravated criminal sodomy. See Williams , 303 Kan. at 756, 368 P.3d 1065 (if jury instructed on alternative means, there must be sufficient evidence to support each alternative means charged to ensure verdict unanimous as to guilt). Nor would the record support such a claim.
Thurber also argues the verdict varied from the charge and the statute because he was not charged with capital murder "by committing a combination of two underlying crimes" and because "the statute does not make available such an option." In other words, Thurber contends he was convicted of a charge not set out in the complaint. This also is without merit. See State v. Morton , 277 Kan. 575, 581, 86 P.3d 535 (2004) (instruction *419 and conviction on combined theories proper; no violation of constitutional or statutory right).
4. Jurors Challenged for Cause
Thurber contends the district court erred by denying his challenges for cause during voir dire with respect to two seated jurors-S.R. and J.H. Thurber argues S.R.'s answers established S.R. was mitigation impaired, i.e., unable to give meaningful consideration to the mitigating circumstances Thurber would later offer during the penalty-phase proceeding. As to J.H., Thurber does not fully explain his argument but presumably contends J.H. was not impartial given his connections to the victim's friends and distracted because of his possible financial hardship if seated.
4.1.1 Additional Facts, re: S.R.
During voir dire, Thurber's counsel questioned a panel of venire members about their death penalty views and inquired whether they could consider a life sentence without parole. To assist with the legal concepts, counsel presented a hypothetical asking the venire members to assume they were seated on a jury that just found someone guilty of capital murder. After one person responded that "severe punishment" should be imposed, counsel asked S.R. if he shared a similar view. The following exchange occurred:
"[S.R.]: Beyond a reasonable doubt should be punished.
"[Defense counsel]: And they get what they gave out?
"[S.R.]: Right.
"[Defense counsel]: [J.S.]?
"[Venire member J.S.]: I agree with him.
"[Defense counsel]: [S.R.]?
"[S.R.]: I believe if the evidence is there and they're guilty beyond a reasonable doubt then, yes, I could vote for the death penalty. It would have to be, you know, I would have to be really convinced."
Defense counsel asked S.R. if after finding a defendant guilty for capital murder he would vote for the death penalty. S.R. replied, "Yes." After a brief exchange with other venire members, defense counsel returned to S.R.:
"[Defense counsel]: [S.R.], are there circumstances where you will not give the death penalty?
"[S.R.]: The way that reads; I will give the death penalty.
"[Defense counsel]: Life without parole, would that even be a possibility?
"[S.R.]: Not if the evidence is there.
"[Defense counsel]: The proof beyond a reasonable doubt for guilt, is that what you're saying?
"[S.R.]: Right."
Defense counsel then discussed possible mitigating circumstances, asking whether a defendant's young age would be a factor leading to a life sentence without parole. S.R. replied, "Age would be no factor." When counsel asked whether he would weigh a defendant's young age at all in his consideration, S.R. replied, "No." Counsel then asked if S.R. would consider mental illness as a mitigating circumstance. He replied, "No." Following S.R.'s answer, defense counsel moved to excuse S.R. and three other venire members as "mitigation impaired."
The district court judge then questioned the four challenged venire members, starting with D.M.:
"THE COURT: Do you understand that the law requires that in order for you to impose the death penalty or vote for the death penalty, you have to find that the State has proven beyond a reasonable doubt one or more aggravating factors. That's what I'll instruct you on.
"[D.M.]: Okay.
....
"THE COURT: If I instructed you in order to impose the death penalty you must find beyond a reasonable doubt that one or more aggravating factors have taken place, and you have to use the aggravating factor that I tell you, not what you think should be [an] aggravating factor, do you understand the difference?
"[D.M.]: Yes.
"THE COURT: Let's say none of those things on that board, aggravating factors, and the State does not present anything more than that, you've said that you think *420 if that happened, death should be the punishment?
"[D.M.]: Right.
"THE COURT: But if I instruct you in the law that [the] State has to prove certain aggravating factors, they don't do it, they present everything on there but not what I say the aggravating factors have to be, and I tell you, you cannot vote for the death penalty unless the State proves beyond a reasonable doubt certain aggravating factors, then would you vote for death or would you vote for life?
"[D.M.]: Life without parole.
"THE COURT: Why would that be?
"[D.M.]: Because-
"[Defense counsel]: I didn't hear the answer.
"THE COURT: He said he would vote life without parole. Even though you personally think that would be death, you would be willing to follow the instructions?
"[D.M.]: If they found him guilty beyond a reasonable doubt and then he was not-he was saying-I would be going for it if he pretty well knows what he did. I don't know.
"THE COURT: I know this is kind of [a] hard concept to fathom. Given that scenario, if all those things were proven, you think the proper punishment should be the death penalty?
"[D.M.]: Yes. Yes.
"THE COURT: But if I tell you that's not the law in the State of Kansas, that the State has to prove more than that to impose the death penalty, they have to prove certain aggravating factors beyond a reasonable doubt. Let's say they fail to do that. Okay. They proved everything on that board but they didn't prove aggravating factors that I'm going to give you in an instruction. They failed to do that beyond a reasonable doubt. Even though you think, given that scenario, your personal opinion is they should be put to death, if I tell you that's not what the law is and the State doesn't meet its burden, could you vote for life without the possibility of parole, or would you go ahead and vote for death because that's your personal opinion?
"[D.M.]: Death is just my personal opinion.
"THE COURT: But would you follow the law I gave you?
"[D.M.]: Yes.
"THE COURT: Or would you vote for death just because you think that's what is right? That's what you're going to do?
"[D.M.]: Yes, I would be going with death because that's the way I think it should be taken care of.
"THE COURT: So you think you would. [D.M.], what I am going to do is excuse you for cause. Thank you."
The district judge then turned to S.R.:
"[THE COURT]: [S.R.], you just heard that exchange. Was that clear as mud?
"[S.R.]: It's clear.
"THE COURT: In other words, you've expressed the opinion also that given that scenario you think the proper punishment should be death. If I told you it takes more than that, that you have-the State has to prove certain aggravating factors beyond a reasonable doubt, and even though all these things here were proven, if they didn't prove an aggravating factor, you would have to vote for life without [the] possibility of parole. You could not vote for death? Could you do that?
"[S.R.]: What I read over there, if that was all true, I would vote for the death penalty.
"THE COURT: ... [E]ven if I told you that's not [the] law?
"[S.R.]: How could it not be the law if it's all-
"THE COURT: If the State legislature said in order to invoke the death penalty you have to have certain aggravating factors, and I'm not going to go in to what those are, but if you were picked as [a] jury [member], you would be instructed on there. If all these there are not aggravating factors, if [the] State did not prove an aggravating factor, could [you] follow the instructions and not vote for the death penalty, which would be life in prison without [the] possibility of parole. Could you do *421 that, even though it went against your personal feeling that [the] death penalty should be imposed; given that scenario?
"[S.R.]: If the evidence presented to me changed that a little bit like that, then I would go for life without parole.
"THE COURT: But if you have that scenario, everything on there, but [the] State didn't prove an aggravating factor, as I explain what those mean to you, could you vote for life without parole, or would you feel you would have to vote for death because that was your personal belief.
"[S.R.]: Under the circumstances I think you're talking about, I would go for life without parole.
"THE COURT: Even though it's not ... your personal opinion, you could follow my instructions?
"[S.R.]: What I read there was the death. What you're saying added to it, changed it just a little bit, then I change.
"THE COURT: No, I'm saying hypothetically everything on there was proven.
"[S.R.]: Yes.
"THE COURT: But if I instruct you in the law and I say, [S.R.], Kansas Legislature has given us certain aggravating factors. That's their decision; not yours, not mine. That's the State Legislature. Says we consider these aggravating factors. Only if these aggravating factors are proven, one or more of them, then in that instance [a] person can be put to death.
"If the State does not prove one or more of these aggravating factors, then you cannot vote for death, even if you think that should be the proper punishment.
"Could you follow that instruction, even if it's not the same as your personal opinion what the punishment should be.
"[S.R.]: I think I could follow the law.
"THE COURT: Now the second part of that is, [defense counsel] asked you about mitigating factors. Now you may be given a list of possible mitigating factors. And the question is not how much weight you would give to those. In other words, whether you think that is important or not important, but would you at least consider all the mitigating factors. Think about it, talk to the other jurors about it; or would you just, I'm not even going to consider mitigating factors. He did it. There should be no debate. Or would you be willing to consider any mitigating factors and talk about them with the other jurors?
"[S.R.]: Yes, I think they should be thought about and talked about."
Before questioning the other challenged venire members, the judge stated: "Okay. Now, I don't want to go through these questions again. ... [D]o you get the idea of the questions I'm asking?" A brief exchange occurred between the judge and the two other venire members. Both stated they could set their personal opinions aside and consider mitigating circumstances. The judge allowed defense counsel to follow up.
Defense counsel again questioned S.R. about his willingness to consider age and mental illness as mitigating circumstances. Counsel asked if he would consider a person's age, and S.R. replied: "Certain stages of it will be considered. Early age, teenager versus 50, 60. That's a different scenario." Defense counsel inquired further:
"[Defense counsel]: Sure. In Kansas you cannot execute someone if they're under 18. Let's forget about 12 year[s] old or 16 year[s] old, or 16, 17 year[s] old. They cannot be executed. You have to be 18 or over.
"... [Would] that factor into your decision to give life or death that was heinous, atrocious, cruel, over and beyond what I put up there[?] All of you've found him guilty of aggravated murder. Over and above that, can you look at age and give it consideration and effect to decide life or death?
"[S.R.]: Anything 19 or over, I would say it goes.
"[Defense counsel]: It goes? That you don't count it?
"[S.R.]: Right.
"[Defense counsel]: That's what-you would not consider that?
"[S.R.]: Right. Right."
Defense counsel then addressed mental illness.
*422 "[Defense counsel]: And if I heard you right, mental illness, because you said if he was sane; mental illness would not work into the evaluation?
"[S.R.]: That's right.
"[Defense counsel]: You would not be able to consider it?
"[S.R.]: Not if he's sane, no."
Defense counsel renewed his motion to strike S.R. for cause. Before ruling, the judge inquired if the prosecutor wanted to ask S.R. anything. The following exchange occurred.
"[Prosecutor]: [S.R.], there will be evidence at sentencing of aggravating factors and mitigating factors. The judge will give you an instruction saying you have to weigh that. If aggravating outweighs mitigating, then it is death. If mitigating outweighs the aggravating, then it's life without parole. Do you understand that?
"[S.R.]: Yes, I do.
"[Prosecutor]: Now, the judge is going to give you a list. May be one aggravating, may be numerous mitigators; age, mental illness, may be something else. The question is can you look at all those things, weigh them and determine which ones in your mind weigh more? Can you do that, looking at the factors the judge gives you?
"[S.R.]: I'm sure I can.
"[Prosecutor]: That's what the judge has asked you previously. Can you listen to his instructions and look at all that, knowing that everybody weighs things differently; some say, hey, age is very important to me, some may be when he gets 20 years old he knows what he's doing. We all have different life experiences. So you can assure the judge when he gives you all the factors, mitigating and aggravating, you will look at all of them but you may weigh them differently?
"[S.R.]: Could be.
"[Prosecutor]: Okay. So you can give the judge a guarantee that you'll look at all those factors, just look at them all, and determine the weight of those factors?
"[S.R.]: I can do that."
The judge followed up and stated:
"[S.R.], ... part of the problem comprehending this I think is a matter of semantics. [Defense counsel] uses the word[s], are you willing to consider a factor, and [the prosecutor] says are you willing to weigh a factor. There is a difference. If I tell you, give you an instruction that age must be considered but you decided on your own that should receive very little weight or [a] great deal of weight, that's your decision. At least you'll consider whether you give it much weight or not. That is a different issue.
"Do you understand the difference between the two concepts? The question is, will you at least consider every mitigating circumstance? Whether you give that a great weight or little weight, that's your decision. But you have to at least consider that.
"Now, if you are of such a mental state that you wouldn't even consider any mitigating factors, then I need to know about that. We need to know that, because you will not be a fair juror. You would not be giving Mr. Thurber a fair trial.
"If you're of that mind set, and only you will know that, then just tell me. Nobody is going to criticize you if you think, well, they've proven capital murder, that's all I know. I'm not going to weigh these factors. That's [a] waste of my time. If that's your mind set, then let me know.
"If it [is] not, and you are willing to hold the State to its burden that they prove one or more aggravating circumstances, if they do that then weigh those; consider at least all the mitigating circumstances, giving those mitigating circumstances the weight that you think is proper, be it a little or a lot, but at least consider all of them. Could all of you think you could do that?"
In response, S.R. replied, "Yes."
After another round of questioning with the venire members, defense counsel asked S.R. if there was "some way you could consider a life without parole verdict?" S.R. replied, "Could consider it."
The district court denied defense counsel's motion to strike S.R. At a bench conference, the court explained:
*423 "I believe the answers to the questions would indicate[ ] that those four [sic ] p[ro]spective jurors could follow the Court's instructions concerning the law on death penalty that regardless of their personal beliefs on when and if the death penalty should be imposed, that they could require the State to prove beyond a reasonable doubt that one or more ... aggravating factors are proven, and that those aggravating factor or factors, plural, are not outweighed by any mitigating circumstances."
4.1.2 Additional Facts, re: J.H.
During another panel's questioning, defense counsel addressed J.H., who indicated on a questionnaire he did not think he could be fair. Counsel asked him to explain. J.H. responded, "I know a lot of individuals that were friends with the victim." Counsel asked J.H. if these people talked to him about the murder. He replied, "They haven't really talked about it. Just sent emails around." He explained why he did not think he could be fair:
"Just like I say, hearing friends talk about it and everything they don't talk about. They're talking about their feelings toward the whole deal. I don't know that, per se, not be fair, but hearing all that from them, I don't know, just be kind of hard to actually have to deal with listening to them talk about it and be here as well."
When counsel asked J.H. if he thought Thurber was "guilty at this point," J.H. replied, "No." He also answered, "No," when asked if he was leaning toward guilt. He confirmed he understood the presumption of innocence and presumed Thurber innocent at that moment. Counsel asked if he could "set aside what you've heard and what you talked to people about?" J.H. replied he could. Later, J.H. offered the following: "I think I can be fair. I haven't made a decision either way. Like I say, he's innocent until proven guilty. That's just the way it is."
The discussion turned to finances and whether any juror would suffer a financial hardship if seated. J.H. said he was laid off and looking for work the previous two months. He followed up, "[M]y bills are actually stacking up." He expressed his concern about finding a job:
"If I don't find a job, I'm going to lose my house, my vehicles, everything I own. If being here for a long period of time, not being able to have a job, find a job, that's going to put me in a big bind."
Counsel asked if his concerns about finding a job and losing his house and belongings would impair his ability to sit as a juror. J.H. replied, "[I]t will be on my mind, yeah." Counsel then asked, "Do you think it would make it so you really shouldn't be a juror in this case?" J.H. replied, "At this point I think so." Defense counsel moved to excuse J.H.
The judge asked J.H. if his financial situation would interfere with his ability to listen to the evidence, consider it, and be fair to both sides. The transcript reflects he replied, "I don't know. It will [a]ffect my ability to be fair and impartial ." (Emphasis added.) The judge again asked whether his financial concerns would affect his ability to listen to and concentrate on the evidence. J.H. replied, "No," and the judge denied the request to excuse J.H., but permitted defense counsel to inquire further.
Defense counsel asked J.H. what his financial situation would be like in several weeks once the trial was underway. He said, "I'm sure there [are] people I can go borrow from to actually make sure bills get paid. I'm sure there [are] a few people out there that can help me out here and there." And after another back and forth, J.H. again said he could "borrow from here and there" and he "can deal with it later on." Defense counsel renewed the challenge, but the court denied it, explaining:
"The request to challenge [J.H.] for cause is denied. Even though [there] probably will be financial hardship, as it would be for most jurors, he has indicated he could still listen to the evidence, make a decision, and that any distress he may suffer of financial circumstances would not [a]ffect his ability to be fair and impartial."
4.2 Standard of Review
Because a trial judge is in a better position than an appellate court to view *424 venire members' demeanor as they are questioned and respond, the judge's ruling on a challenge for cause is reviewed for abuse of discretion. State v. Robinson , 303 Kan. 11, 154, 363 P.3d 875 (2015), cert. denied --- U.S. ----, 137 S.Ct. 164, 196 L.Ed.2d 138 (2016). Judicial discretion is abused when judicial action is (1) arbitrary, fanciful, or unreasonable, i.e., if no reasonable person would take the view adopted by the trial court; (2) based on an error of law, i.e., the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, i.e., if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. State v. Corey , 304 Kan. 721, 730-31, 374 P.3d 654 (2016).
4.3 Analysis
Under K.S.A. 22-3410(2)(i), a prospective juror may be removed for cause when "[h]is [or her] state of mind with reference to the case or any of the parties is such that the court determines there is doubt that he [or she] can act impartially and without prejudice to the substantial rights of any party." A prospective juror's death penalty views may require the judge to remove the juror for cause. See State v. Cheever , 306 Kan. 760, 786-87, 402 P.3d 1126 (2017).
We focus on "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " Wainwright v. Witt , 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed. 2d 841 (1985) ; see also Robinson , 303 Kan. at 155, 363 P.3d 875 (bias toward death or life may be grounds for removal). "The fundamental purpose of the inquiry is whether the juror will follow the law." Sellers v. Ward , 135 F.3d 1333, 1341 (10th Cir. 1998). A juror's bias regarding the death penalty need not be proved with unmistakable clarity. Robinson , 303 Kan. at 155, 363 P.3d 875.
On appeal, the question is whether the district court's decision on a for-cause challenge is fairly supported by the record. State v. Carr , 300 Kan. 1, 114, 331 P.3d 544 (2014), rev'd and remanded 577 U.S. ----, 136 S.Ct. 633, 193 L.Ed. 2d 535 (2016). "If the record contains conflicting or ambiguous information, the United States Supreme Court has expressed its belief that deference is owed to 'the trial court, aided as it undoubtedly was by its assessment of [the prospective juror's] demeanor.' " Carr , 300 Kan. at 114, 331 P.3d 544 (quoting Wainwright , 469 U.S. at 434, 105 S.Ct. 844 ). Thurber's S.R. challenge is rooted in Morgan v. Illinois , 504 U.S. 719, 739, 112 S.Ct. 2222, 119 L.Ed. 2d 492 (1992) ("Any juror to whom mitigating factors are ... irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial.").
We note Thurber also cites Boyde v. California , 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed. 2d 316 (1990), in asserting the Eighth Amendment requires a "capital juror must be able to consider and give effect to all relevant mitigating evidence offered by a defendant." But the United States Supreme Court's Eighth Amendment jurisprudence addresses procedural and legal impediments restricting a capital jury's ability to consider and give effect to relevant mitigating evidence. See Lockett v. Ohio , 438 U.S. 586, 604-05, 98 S.Ct. 2954, 57 L.Ed. 2d 973 (1978) (sentencer in capital case must be permitted to consider any relevant mitigating factor). Under the Eighth Amendment, it is the procedure that is at issue-not the individual juror's ability to be impartial, which is what Thurber challenges about S.R. and J.H. See Wainwright , 469 U.S. at 423, 105 S.Ct. 844 (juror exclusion from capital sentencing jury "is not grounded in the Eighth Amendment's prohibition against cruel and unusual punishment, but in the Sixth Amendment"). Thurber's reliance on Boyde is misplaced.
Thurber's S.R. challenge presumes it is impermissible to seat a juror who will consider some, but not all, mitigating circumstances. But S.R. said he was willing to follow the law and consider and weigh mitigating circumstances. The district court clarified the difference between considering a factor and weighing a mitigating factor. And the judge asked whether S.R. thought he would not consider mitigating circumstances or *425 whether he was willing to "consider at least all the mitigating circumstances, giving those mitigating circumstances the weight that you think is proper, be it a little or a lot, but at least consider all of them." S.R. gave a single answer, "Yes." This indicates S.R. ultimately agreed he could consider all mitigating circumstances.
Taken as a whole, the record supports the court's decision to deny the motion to strike S.R. for cause. See Carr , 300 Kan. at 121, 331 P.3d 544 (although certain responses cause concern, challenged jurors professed understanding of and fidelity to the law governing jury's role and function in capital sentencing; district judge did not abuse discretion in refusing to excuse for cause). To the extent some responses conflicted, this court gives deference to the trial judge, who observed S.R.'s demeanor. The judge did not abuse his discretion.
Moving to J.H., neither reason we perceive for the challenge warrants relief. The concern appears to be based on J.H.'s acquaintance with several of J.S.'s friends and the financial hardship of jury service. J.H. acknowledged he knew several of J.S.'s friends, but added that he presumed Thurber innocent and could put aside anything he heard before trial. He also said he could be fair and had not "made a decision either way" with respect to Thurber's guilt. As to his financial hardship, J.H. explained it would not interfere with his ability to listen to and concentrate on the evidence. He also said he could "borrow from here and there" to make sure bills got paid. From this, we are not persuaded J.H.'s financial situation justified excusing him for cause.
Finally, we discount J.H.'s comment, "I don't know. It will [a]ffect my ability to be fair and impartial," when asked whether his financial hardship would interfere with his ability to listen to the evidence, consider it, and be fair. Neither the judge nor counsel followed up as would be expected after such a remark. And defense counsel immediately said, "Maybe we've got this resolved"-an odd announcement in reaction to the comment as quoted in the transcript. And it is not clear in context that J.H. understood the question or intended his response to mean he would be biased. Indeed, he said earlier in voir dire he had not prejudged Thurber and presumed him innocent.
In summary, the trial judge did not abuse his discretion by denying Thurber's motion to strike J.H. for cause. The judge was in the better position to view J.H.'s demeanor and consider his responses, leading us to defer to the judge's judgment when the record is ambiguous or incomplete.
5. Sufficiency of the Evidence to Support Oral Verdict
The bailiff misread the verdict form when announcing it in court. The bailiff incorrectly said "criminal sodomy" when stating the crime underlying the capital murder conviction, instead of aggravated criminal sodomy. No one noticed the inconsistency.
Unlike aggravated criminal sodomy, which encompasses nonconsensual sodomy between adults, Thurber could not have been convicted of criminal sodomy as that offense was defined at the time of his crimes. See K.S.A. 21-3505(a) (defining criminal sodomy as same-sex sodomy, sodomy with an animal, or sodomy involving a child at least 14 but less than 16 years old). Thurber seizes on this and casts this circumstance as a sufficiency-of-the-evidence error. He argues his capital murder conviction must be reversed because there was no evidence to support the oral verdict. We reject this argument.
5.1 Additional Facts
After learning the jury reached a guilt-phase verdict, the judge reconvened in open court. The foreman handed the written verdict form to the bailiff, who delivered it to the judge. The judge reviewed it and handed it back to the bailiff to read aloud. The bailiff stated:
"State of Kansas versus Justin E. Thurber, Case No. 07-CR45-A; we, the jury, unanimously find the defendant guilty of capital murder of [J.S.]
"We, the jury, unanimously find the defendant guilty of capital murder on the theory of criminal sodomy of [J.S.]
*426 "We, the jury, unanimously find the defendant guilty of aggravated kidnapping of [J.S.]" (Emphasis added.)
The judge asked the jury foreman, "Is this the jury's verdict?" The foreman replied, "Yes, it is." Defense counsel declined to have the jury polled.
Instruction 6 identified the elements of capital murder based on attempted rape, and Instruction 7 provided the elements of attempted rape. Instruction 8 addressed the alternative count of capital murder based on aggravated criminal sodomy and informed the jury that, to convict, the State had to prove J.S. "was a victim of aggravated criminal sodomy" and that her murder "was done in the commission of or subsequent to such aggravated criminal sodomy." Instruction 9 provided the elements of aggravated criminal sodomy.
The instructions also informed the jury if it found Thurber guilty of capital murder to indicate on the verdict form which of three alternative theories was applicable. Theory 1(a) stated: "We, the jury, unanimously find the defendant guilty of capital murder on the theory of attempted rape of [J.S.]." Theory 1(b) stated: "We, the jury, unanimously find the defendant guilty of capital murder on the theory of aggravated criminal sodomy of [J.S.]." Theory 1(c), which the jury foreman signed, stated: "We, the jury, unanimously find the defendant guilty of capital murder on the combined theory of attempted rape and the theory of aggravated criminal sodomy of [J.S.]."
The bailiff's recitation did not accurately reflect this written verdict. The transcript indicates the bailiff omitted the word "aggravated" and possibly read Theory 1(b) rather than Theory 1(c) when reciting the theory underlying the capital murder conviction.
5.2 Standard of Review
This situation requires us to consider whether the oral or written verdict controls. Sufficiency of the evidence becomes an issue only if the oral verdict's misreading trumps the written form. No Kansas case has addressed this.
At least one jurisdiction holds that determining which verdict controls, i.e., an oral or written verdict, presents a question of law. See United States v. Boone , 951 F.2d 1526, 1532 (9th Cir. 1991). Statutory interpretation also presents a question of law. State v. Darrow , 304 Kan. 710, 713, 374 P.3d 673 (2016). Questions of law are generally subject to unlimited review by an appellate court. State v. Hankins , 304 Kan. 226, 230, 372 P.3d 1124 (2016). We view this as a question of law.
5.3 Analysis
We have located one jurisdiction that suggests a variance between the written and oral verdicts requires reversing the conviction, but its facts do not support Thurber's argument because there was no written verdict that could control in that case. See Hayes v. State , 44 Ala. App. 499, 502, 214 So.2d 708 (1968) ("Although a verdict may be written or oral, where there is both a written and oral verdict, it is necessary that each be in accord with the other. If any inconsistence or ambiguity exists in the verdict, it must be corrected prior to the dismissal of the jury and failure to do so, as in the instant case, will result in a reversal of the case upon trial."). Others jurisdictions hold a written verdict generally controls over an oral verdict. See United States v. Rojas , 617 F.3d 669, 679 (2d Cir. 2010) (written verdict form reflects operative verdict); Boone , 951 F.2d at 1532-33 (written verdict submitted to trial court controlled over court's misreading of verdict in open court, even though jurors affirmed that oral reading of verdict was true and correct verdict; "[i]t would elevate form over substance to find that the misread verdict was the operative verdict. ... To conform the written verdict to reflect the misread verdict would frustrate the jury's intent and the entire jury process.").
In Thurber's case, the record demonstrates the jury's written verdict should be the operative one. The State charged a count of capital murder based on an aggravated criminal sodomy theory; the jury was instructed on capital murder based on an aggravated criminal sodomy theory; and the second and third options on the *427 written verdict form gave the jury the choice of convicting Thurber of capital murder on an aggravated criminal sodomy theory or on a combined theory of attempted rape and aggravated criminal sodomy. The jury selected the combined theory. Thurber was not charged with, the jury was not instructed on, and the jury did not convict him of capital murder based on the nonaggravated form of criminal sodomy. Under these circumstances, we must conclude the written verdict reflects the jury's intent.
Moreover, K.S.A. 22-3421 suggests a written verdict controls. It provides:
"The verdict shall be written, signed by the presiding juror and read by the clerk to the jury, and the inquiry made whether it is the jury's verdict. If any juror disagrees, the jury must be sent out again; but if no disagreement is expressed, and neither party requires the jury to be polled, the verdict is complete and the jury discharged from the case. If the verdict is defective in form only, it may be corrected by the court, with the assent of the jury, before it is discharged." K.S.A. 22-3421.
The statute plainly requires a written jury verdict. It also demands the written verdict be "read by the clerk to the jury, and the inquiry made whether it is the jury's verdict." K.S.A. 22-3421. And even though the jury assents to the verdict after it is read aloud, it still assents to the written verdict. Moreover, if any juror disagrees, "the jury must be sent out again" to deliberate and return with yet another written verdict. K.S.A. 22-3421. If no disagreement is expressed, the "verdict is complete," i.e., the written verdict becomes effective. K.S.A. 22-3421. Finally, the statute explains that "[i]f the verdict is defective in form only, it may be corrected by the court, with the assent of the jury, before it is discharged." K.S.A. 22-3421. And because a verdict must be written, any correction must necessarily be reflected on the written form.
The statute speaks to only one verdict-the written one-and reflects a view that written verdicts are preferred to oral verdicts. See Ex parte Lamb , 113 So.3d 686, 691 (Ala. 2011) ; Hayes , 44 Ala. App. at 502, 214 So.2d 708 ("[W]ritten verdicts are to be encouraged for the sake of accuracy and to avoid delays incident to corrections."). Absent some strong indication the oral pronouncement better reflects the jury's will, the jury's written verdict controls. As discussed, there is no such indication here.
Nor are we concerned with the jury foreman having agreed with the bailiff's misreading. A similar situation occurred in Boone when the trial judge misread the jury's written verdict in a 41-count case and mistakenly announced the jury had acquitted the defendant of four counts on which the written verdict actually reflected she had been convicted. When the trial judge asked if " 'this is your true and correct verdict,' " the jurors said it was. 951 F.2d at 1532. The Boone court recognized the jurors' agreement could have been to "the judge's reading of the verdict or to their written verdict." 951 F.2d at 1532. Nevertheless, the Boone court reasoned:
"To conclude that the jury agreed with the judge's mistaken reading of the verdict, rather than the jury's written verdict, requires us to assume that the jurors unanimously changed their minds in a split second with respect to their verdicts on these four counts. It is unreasonable to expect the jurors to have corrected the judge's misreading of their verdict and to conclude that by their failure to do so have assented to the misread verdicts. This is particularly true because the jurors did not have their verdict form in front of them while the judge read the verdict." 951 F.2d at 1532-33.
We hold the jury's written verdict controls under the circumstances presented. This makes it unnecessary to consider Thurber's claim the evidence was not sufficient to support the oral verdict.
6. Character and Prior Crime Evidence
Before trial, the State moved to admit testimony by more than a dozen women who had previous encounters with Thurber ranging from unwelcome advances to physical assaults during sexual encounters. The district court ruled all could testify during the guilt phase, but only six actually did. Thurber *428 contends their testimony was inadmissible because it was either improper character evidence under K.S.A. 60-447 or inadmissible prior crimes evidence under K.S.A. 60-455. We hold the testimony was admissible.
6.1 Additional Facts
The six women who testified about their previous encounters with Thurber were: Thurber's ex-girlfriend Swartzell; J.S.'s Tigerette teammates Elizabeth Rush, Stacia Barrera, and Lori Legleiter; and Thurber's fellow Subway employees Megan Malloy and Nicole Hayes. It is necessary to summarize their testimony.
Swartzell testified about Thurber's sexual behavior with her. She explained when she was interested in a sexual encounter, Thurber was uninterested. But, she added, if she did not want a sexual encounter or resisted, Thurber would "get excited" and want to engage in sexual intercourse. She also testified Thurber occasionally choked her during sex. She described one episode in which Thurber tightened and relaxed his grip around her neck. Another time, he used his arm and applied constant pressure across her neck. Swartzell testified Thurber sodomized her with a small plastic item during this encounter. She also stated he took her to the Kaw Wildlife Area several times where they had sex shortly before their breakup. She described the sex as "[r]ough."
Rush testified she left dance practice before J.S. on the day J.S. disappeared. As she drove away, she said she saw Thurber sitting in a blue Cadillac at an entrance near the college parking lot. She testified she also saw Thurber parked in the car near the lot entrance the day before as she was leaving dance practice.
Barrera said she found a note and rose on her car in 2004. The note, signed by Thurber, stated he wanted to get to know her and instructed her to call him. She threw the note away.
Legleiter testified that on January 2, 2007, after her evening shift at an Arkansas City restaurant, she saw a light blue car slowly drive by. She could not make out the driver but described him as a larger individual, who appeared to be looking at her. As she drove home, she noticed the same car driving slowly on the road in front of her. She passed the car, but started to get concerned when she noticed it behind her after making a turn. She then made additional turns to see if the car was really following her and became more worried as the car made the same turns. She drove to the Arkansas City police station and parked. When she did not see the car, she started driving back home. As she passed a gas station, the car pulled out of the parking lot. She drove back to the police station, parked again, and called several people about her concern. She eventually sped home using back roads.
Legleiter also described seeing the light blue car again on January 5, 2007, the day J.S. disappeared, when arriving for dance practice at the college. She said the car passed her and she made eye contact with the driver, whom she recognized as Thurber. She walked to practice and told her teammates, including J.S., that Thurber was the driver who followed her a few nights earlier.
Malloy noticed Thurber drive by the Subway where she and Thurber worked on January 2, 2007, while she was doing her closing routine at 10 p.m. She said he made several more passes, which concerned her. She called the Subway store manager, Hayes, who told her to write down her complaint. Malloy testified she wrote: " 'Justin has drove by here at least 12 times since I closed 15 minutes ago. I don't want to work with him. He's creeping me out. He's been calling up here about stupid shit. He just drove by again. Please, don't make me work with him.' " Malloy said she requested police escorts to her vehicle the next two nights.
Hayes testified she hired Thurber in December 2006. She said the day Thurber filled out his new-hire paperwork, she found on her windshield a card from him and a rose. The card read: " 'First time I saw your beautiful eyes and smile, I just haven't been able to stop thinking of you beautiful. You're always in [my] heart. You single?' " Hayes said she was generally uncomfortable around Thurber.
Hayes also described how Thurber approached her as she arrived at the restaurant *429 door on January 3, 2007, at about 6:30 a.m. He wore a black jacket, black stocking cap, jeans, and boots. He told her his car was broken down and he needed a ride home. Hayes said she unlocked the door and went inside where she found Malloy's note from the previous night. When Thurber approached the door, Hayes told him she did not have time to give him a ride. She locked the door. Hayes said Thurber walked away, but she saw him driving by 10 minutes later. She asked for a police escort at work the following morning because she was worried Thurber would be there. When she arrived after meeting with police, she attempted to open the door but discovered someone jammed wood in the keyhole. She had another police escort the following morning-the day J.S. disappeared.
The district court gave a limiting instruction with respect to testimony by Legleiter, Malloy, and Swartzell. While the court was unequivocal about needing a limiting instruction with respect to Legleiter's testimony, its instruction additionally addressed Malloy's testimony "in an abundance of caution" and Swartzell's testimony because "[t]he rough sex might be considered a crime." The limiting instruction stated in relevant part:
"Evidence has been admitted which may tend to prove that the defendant followed other women in his car and sexually assaulted or attempted to sexually assault other women. This evidence may be considered solely for the purpose of proving the identity of the person who committed the crime(s) against [J.S.] or for the purpose of proving the defendant had a common plan or general method of operation which may tend to prove such identity.
....
"It is for you to determine the weight and credit to be given the evidence referred to above for the limited purposes referred to above. The burden of proof never shifts to the defendant."
6.2 Standard of Review
"A district court's decision to admit or exclude evidence is assessed using a three-step standard of review. First the court addresses whether the evidence in question is relevant. State v. Reed , 300 Kan. 494, 508-09, 332 P.3d 172 (2014). Relevant evidence is that which has 'any tendency in reason to prove any material fact.' K.S.A. 60-401(b).
"Relevance has two elements: probative value and materiality. State v. Marks , 297 Kan. 131, 142, 298 P.3d 1102 (2013). Evidence is probative if it furnishes, establishes, or contributes toward proof. Probativity is reviewed for abuse of discretion. Evidence is material if it tends to establish a fact that is at issue and is significant under the substantive law of the case. Materiality is reviewed de novo. 297 Kan. at 142 [298 P.3d 1102]. Second, the court reviews de novo what rules of evidence or other legal principles apply. Finally, the court applies the appropriate evidentiary rule or principle. Review of the district court's application of evidentiary rules depends on the rule applied. Reed , 332 P.3d at 183." State v. Coones , 301 Kan. 64, 77-78, 339 P.3d 375 (2014).
6.3 Analysis
Thurber contends the women's testimony was inadmissible because it was either improper character evidence under K.S.A. 60-447 or inadmissible prior crimes evidence under K.S.A. 60-455. The State argues the evidence was admitted to prove the identity of J.S.'s killer. The State further asserts K.S.A. 60-455 does not apply because the testimony did not implicate prior crimes or civil wrongs.
At the outset, we note Thurber does not challenge relevancy, which is typically the first step in the analysis, so that is deemed waived and abandoned. State v. Reed , 300 Kan. 494, 508-09, 332 P.3d 172 (2014). And while this court is authorized under K.S.A. 2016 Supp. 21-6619(b) to notice unassigned errors if the ends of justice would be served, we perceive no such concern on this point. We turn to the second and third steps, i.e., determining which rules of evidence or legal principles apply and reviewing the district court's application of those rules or principles.
*430 Thurber first contends K.S.A. 60-447 bars the women's testimony because the "incidents reflect on [his] character." He does not expand on this. K.S.A. 60-447 provides:
"Subject to K.S.A. 60-448 when a trait of a person's character is relevant as tending to prove conduct on a specified occasion, such trait may be proved in the same manner as provided by K.S.A. 60-446, except that (a) evidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove the trait to be bad shall be inadmissible, and (b) in a criminal action evidence of a trait of an accused's character as tending to prove guilt or innocence of the offense charged, (i) may not be excluded by the judge under K.S.A. 60-445 if offered by the accused to prove innocence, and (ii) if offered by the prosecution to prove guilt, may be admitted only after the accused has introduced evidence of his or her good character."
The caselaw runs against Thurber's 60-447 contention. See State v. Lowrance , 298 Kan. 274, 291, 312 P.3d 328 (2013) (consensual sex between adults was not evidence of a character trait; rather, it "illustrated a particular pattern of behavior ... from which reasonable inferences could be drawn when considered along with the physical evidence"); State v. Pabst , 268 Kan. 501, 516, 996 P.2d 321 (2000) (evidence that defendant handed guns to wife and mistress and asked them to shoot him if they thought he was worthless did not demonstrate a character trait, but was " 'simply a fact' "; character traits contemplated by K.S.A. 60-447 are " 'traits such as violent, gentle, trusting, or angry' "); State v. Gaines , 260 Kan. 752, 768, 926 P.2d 641 (1996) (ex-wife could testify defendant sucked her big toe during sexual conduct when rape victim reported her attacker twice sucked on her big toe during the attack), abrogated on other grounds by State v. Carr , 300 Kan. 1, 226, 331 P.3d 544 (2014), rev'd and remanded 577 U.S. ----, 136 S.Ct. 633, 193 L.Ed. 2d 535 (2016).
In Thurber's case, nothing about this testimony relayed a particular character trait as contemplated by K.S.A. 60-447 ; rather, it demonstrated behavioral patterns. See Lowrance , 298 Kan. at 290-91, 312 P.3d 328. Thurber leaving unsolicited notes and roses, asking for a ride even though he already had transportation, driving around the Subway a dozen times, and following Legleiter with his car are simply facts from which the jury was free to draw reasonable inferences when considering the other evidence. K.S.A. 60-447 does not apply.
Next, Thurber claims this testimony was inadmissible under K.S.A. 60-455. But he does not specifically identify any crimes or civil wrongs the challenged testimony established. K.S.A. 60-455 provides:
"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."
Thurber's argument is not readily apparent when looking at the record. Much of the testimony falls outside K.S.A. 60-455's purview because, as the State asserts, it is not evidence of prior criminal conduct or civil wrongs. See State v. Robinson , 303 Kan. 11, 237, 363 P.3d 875 (2015) ( K.S.A. 60-455 did not bar admission of testimony that did not demonstrate defendant committed any prior crimes), cert. denied --- U.S. ----, 137 S.Ct. 164, 196 L.Ed.2d 138 (2016). Leaving notes and roses on vehicles, without more, does not constitute a crime; nor does asking for a ride. Similarly, driving around a building 12 times in 15 minutes is not necessarily criminal. And even though the court indicated a limiting instruction might be necessary to protect against jury misuse of Swartzell's testimony about rough sex, she never testified any aspect of her sexual relationship with Thurber was anything but consensual.
The district court's determination that Legleiter's testimony required a limiting instruction was presumably based on the stalking statute. See K.S.A. 21-3438(a) ("Stalking *431 is an intentional, malicious and repeated following or harassment of another person and making a credible threat with the intent to place such person in reasonable fear for such person's safety."); see also State v. Rucker , 267 Kan. 816, 834, 987 P.2d 1080 (1999) (holding term "repeated" did not render statute unconstitutionally vague because "[i]t simply means that the following or harassment must have occurred more than one time"). But Legleiter simply related she was persistently followed one time by another vehicle and scared.
Legleiter's testimony identifying Thurber as being at the community college campus during the January 5 practice and Rush's corroborating testimony placing him there during the January 4 and 5 practices did not tend to demonstrate a prior crime or civil wrong. And this evidence was relevant because it placed Thurber and J.S. at the same location at the time J.S. was last seen. See State v. Corbett , 281 Kan. 294, 309-10, 130 P.3d 1179 (2006) (reasoning there was circumstantial evidence supporting inference defendant was present and committed a murder when eyewitnesses said they saw defendant outside victim's apartment during timeframe in which murder occurred).
Because the women's testimony did not demonstrate Thurber committed any prior crimes or civil wrongs, K.S.A. 60-455 did not bar its admission.
Finally, Thurber argues admitting this testimony in the guilt phase prejudiced him in the penalty phase, since the evidence was not relevant to the heinous, atrocious, or cruel aggravating factor upon which the State relied. This argument is independent of whether the testimony was properly admitted in the guilt-phase proceeding. He asserts that because this testimony was irrelevant to the sentencing determination, "the prosecution should either be prohibited from putting on the evidence in the first phase, forgo pursuing a second phase, or move to empanel a different jury for the second phase." The logical conclusion from this is that a single jury could never hear both the guilt and penalty phases in a death penalty trial because there will inevitably be evidence admitted by the State in the guilt phase that has no or limited relevance for sentencing. We decline to adopt such a rule.
We note the jury was instructed in the penalty phase that it must consider only the evidence from the guilt and penalty phases bearing on the aggravating or mitigating circumstances. This court presumes juries follow the instructions. See State v. Corey , 304 Kan. 721, 734, 374 P.3d 654 (2016) ("The trial court gave those instructions, and appellate courts presume juries follow the instructions given."). In addition, Thurber identifies no caselaw supporting independent guilt and sentencing proceedings before separate juries in capital trials. And we note several jurisdictions permit the same jury to consider guilt-phase evidence during the penalty-phase proceeding when deciding both guilt and sentence. See, e.g., State v. Hausner , 230 Ariz. 60, 87, 280 P.3d 604 (2012) (en banc); People v. Russell , 50 Cal. 4th 1228, 1259, 117 Cal.Rptr.3d 615, 242 P.3d 68 (2010), cert. denied 564 U.S. 1042, 131 S.Ct. 3073, 180 L.Ed.2d 896 (2011).
We hold this testimony was admissible and reject Thurber's argument.
7. First Time In-Court Witness Identification
Thurber next challenges testimony identifying him as the driver of a vehicle matching the description of J.S.'s car on the day J.S. disappeared. Thurber argues this in-court identification was "impermissibly suggestive" because it was the witness' first time to identify him, and it occurred in a courtroom setting in which he was "clearly identified as the defendant in the case."
7.1 Additional Facts
While investigating J.S.'s disappearance and murder, law enforcement learned Melynda Schritter saw a black, medium-sized car approaching her vehicle from the opposite direction on a dirt road south of Arkansas City the day J.S. disappeared. Schritter's description matched J.S.'s car. Officers gave Schritter a photo array that included Thurber, hoping she could identify the driver. She picked a different individual.
*432 At trial, the prosecutor asked Schritter whether the driver she saw was in the courtroom. Defense counsel lodged an "[o]bjection as to identification." The court overruled the objection. Schritter identified Thurber. The prosecutor asked about her previous selection of a different individual from the photo array. She acknowledged that person was not Thurber, but said she was now "100 percent" certain Thurber was the vehicle's driver. Defense counsel did not cross-examine Schritter.
7.2 Standard of Review
Generally, an appellate court reviews "a challenge to an eyewitness identification as a due process determination involving a mixed question of law and fact." State v. Cruz , 297 Kan. 1048, 1058, 307 P.3d 199 (2013). An appellate court applies a substantial competent evidence standard when reviewing the factual underpinnings of a trial court's decision to admit or suppress an eyewitness identification and applies a de novo standard to the ultimate legal conclusion drawn from those facts. 297 Kan. at 1058-59, 307 P.3d 199. A district court's lack of factual findings does not alter an appellate court's standard of review. State v. Moore , 302 Kan. 685, 697, 357 P.3d 275 (2015).
Although not conceding error, the State curiously identifies only the constitutional harmless error standard of review as controlling for this question. See Supreme Court Rule 6.03(a)(4) (2017 Kan. S. Ct. R. 36) ("[A]ppellee must either concur in appellant's citation to the standard of appellate review or cite additional authority."). An appellate court's harmless error review is de novo. See State v. Ward , 292 Kan. 541, Syl. ¶ 8, 256 P.3d 801 (2011). Constitutional error may be declared harmless when the party benefitting from that error proves beyond a reasonable doubt it did not affect the trial's outcome in light of the entire record, i.e., when there is no reasonable possibility the error contributed to the verdict. Ward , 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801.
7.3 Analysis
Generally, district courts must employ a two-step process to determine whether an eyewitness identification is admissible: determining first "whether the police procedure used to obtain the original out-of-court identification was unnecessarily suggestive;" and, if so, "whether there was a substantial likelihood of misidentification under the totality of the circumstances." Cruz , 297 Kan. 1048, Syl. ¶ 2, 307 P.3d 199. This rule typically applies to decide the admissibility of eyewitness identifications following out-of-court identifications.
This court has not addressed whether a first time, in-court identification following an out-of-court failure to identify needs to be tested against the reliability factors applicable in the traditional second prong of the out-of-court eyewitness identification analysis. Other jurisdictions are split on this question. Compare State v. Dickson , 322 Conn. 410, 426, 141 A.3d 810 (2016) (first time in-court identifications implicate due process protections and must be prescreened by trial court), with Byrd v. State , 25 A.3d 761, 767 (Del. 2011) (inherent suggestiveness in normal trial procedure does not implicate due process with respect to initial in-court identifications).
At least one panel of our Court of Appeals has compared a first time, in-court identification to a one-person show-up and concluded the procedure was unnecessarily suggestive. It nevertheless applied the reliability factors and determined the in-court identification was independently reliable. See State v. Jenkins , No. 104,671, 2012 WL 1450439, at *7-8 (Kan. App. 2012) (unpublished opinion) (first time identification at preliminary hearing unnecessarily suggestive because akin to one-person show-up; considering all the circumstances, "the identification testimony was sufficiently reliable to be admitted").
But we need not dive into the merits about this because the State simply asserts "[n]o error occurred" and then argues any error was harmless. The State provides us with no basis to consider the merits, even though such authority exists from other jurisdictions. And the State further fails to explain why its bald assertion of no error should be persuasive even without citation to authority. See *433 State v. Tague , 296 Kan. 993, 1001, 298 P.3d 273 (2013). Given this, we will assume error. See Wilson v. Sebelius , 276 Kan. 87, 91, 72 P.3d 553 (2003) ("Appellate courts generally avoid making unnecessary constitutional decisions."). And in this instance, the assumed error implicates Thurber's constitutional right to due process, so we must apply the constitutional harmless error test. See Ward , 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801.
The State argues "[t]he DNA evidence in the case, along with evidence of hair matching [Thurber's] found in J.S.'s vehicle, and a separate observation of a large male driving the vehicle, overwhelmingly linked [Thurber] to the crimes for which he was charged." In addition, both Schritter and LaDona Peoples, the driver of the car Schritter was riding in, testified they saw a car like J.S.'s car south of Arkansas City, and cell phone records placed Thurber in that general vicinity south and east of Arkansas City. Investigators also found Thurber's shoe prints near the crime scene, and, on the night of J.S.'s disappearance, Thurber's father picked him up near Cowley County State Fishing Lake, where investigators found J.S.'s clothing, wallet, and submerged car.
This independent evidence connects Thurber to the crimes-in particular, to the inside of J.S.'s vehicle. It surely carried as much or more weight than Schritter's in-court identification based as it was on just a glimpse of the driver. And although defense counsel waived cross-examination, Schritter's earlier failure to identify Thurber in the photo array came out in her direct testimony, which would further discount any weight the jury was inclined to give her in-court identification and credibility. Given these circumstances, we hold there is no reasonable possibility the verdict would have been different without Schritter's in-court identification.
Next, Thurber argues the district court committed reversible error by failing to give the jury an eyewitness cautionary instruction. He concedes he did not request this instruction or object to its omission, so we review for clear error. See Robinson , 303 Kan. at 282, 363 P.3d 875 (clear error review of instructional claim requires appellate court to [1] determine whether subject instruction legally and factually appropriate and [2] assess whether court is firmly convinced jury would have reached different verdict had instruction error not occurred).
A trial court must issue a cautionary instruction when an eyewitness identification is critical to the prosecution's case. Moore , 302 Kan. at 704, 357 P.3d 275 ; see PIK Crim. 3d 52.20 (1999 Supp.) (pattern instruction listing various factors jurors should consider in weighing eyewitness reliability and accuracy). But Schritter's in-court identification does not qualify as critical, so that rule is inapplicable. See State v. Mitchell , 294 Kan. 469, 482, 275 P.3d 905 (2012) (identification is critical to the prosecutor's case "because it was the only evidence connecting [defendant] to the crime"); see also State v. Clay , 300 Kan. 401, 411, 329 P.3d 484 (2014) (identification crucial when only one eyewitness and no physical evidence connected defendant to crime); State v. Anderson , 294 Kan. 450, 460, 276 P.3d 200 (2012) (eyewitness' in-court identification of defendant not critical to prosecution's case because substantial additional evidence implicated defendant). In other words, the instruction was not legally appropriate.
8. Victim's Good Character Evidence
Thurber next complains the district court erroneously permitted testimony by J.S.'s mother concerning personal details about her life. He argues this and a framed, portrait-style antemortem photograph of J.S. were part of the "prosecution's strategy to obtain a death verdict" by "present[ing] evidence that J.S. was smart, beautiful, talented, and loved."
8.1 Additional Facts
During the guilt phase, the State called J.S.'s parents to testify. Before her father took the stand, defense counsel objected. First, counsel lodged a relevancy objection; second, counsel asserted the testimony "may invoke the sympathies and prejudice of the jury." Separately, counsel objected to J.S.'s antemortem photograph.
The district court first addressed the photograph. The prosecutor said it would be *434 shown for only "10, 15 seconds" and then taken down. The court ruled it admissible, but said it could be shown only "for [a] brief period of time."
The court then asked about the father's expected testimony. The State explained he would discuss his familiarity with J.S.'s car and events the day she disappeared. The court asked whether there would be questions "about how much he misses his daughter" or "that he loved his daughter" or "[a]nything that might reasonably be anticipated to invoke the passion of the jury." The State assured it would not ask such questions. The court ruled the testimony admissible, concluding it was factual in nature and "not of the type that would appeal to the passions of the jury."
Defense counsel then raised the "same argument" with respect to J.S.'s mother's testimony. The court ruled no questions would be allowed "appealing to or designed to invoke the sympathy of the jurors."
During the father's testimony, defense counsel objected and requested a "continuing objection[ ] from the recent argument at the bench." The court overruled the objection, and the testimony was completed. The State then called J.S.'s mother. She began with some background information about herself and J.S., including J.S.'s full name, date of birth, and educational benchmarks. The prosecutor asked when J.S. graduated high school. J.S.'s mother replied, "May 2006. She was valedictorian." Thereafter, the following exchange occurred:
"Q. So where did she go to college?
"A. Cowley County Community College.
"Q. She gets a scholarship?
"A. Yes, for dance.
"Q. So her passion-one of her passions was dance?
"A. Very much so."
Defense counsel objected "for the reasons set forth at the bench" and asked for a continuing objection. The court overruled the objection.
8.2 Standard of Review
As previously set out,
"A district court's decision to admit or exclude evidence is assessed using a three-step standard of review. First, the court addresses whether the evidence in question is relevant. State v. Reed , 300 Kan. 494, 508-09, 332 P.3d 172 (2014). Relevant evidence is that which has 'any tendency in reason to prove any material fact.' K.S.A. 60-401(b).
"Relevance has two elements: probative value and materiality. State v. Marks , 297 Kan. 131, 142, 298 P.3d 1102 (2013). Evidence is probative if it furnishes, establishes, or contributes toward proof. Probativity is reviewed for abuse of discretion. Evidence is material if it tends to establish a fact that is at issue and is significant under the substantive law of the case. Materiality is reviewed de novo. 297 Kan. at 142 [298 P.3d 1102]. Second, the court reviews de novo what rules of evidence or other legal principles apply. Finally, the court applies the appropriate evidentiary rule or principle. Review of the district court's application of evidentiary rules depends on the rule applied. Reed , 332 P.3d at 183." State v. Coones , 301 Kan. 64, 77-78, 339 P.3d 375 (2014).
8.3 Analysis
Our focus is the mother's testimony. At the outset, we address the State's strenuous argument that Thurber failed to preserve this issue for appellate review. According to the State, Thurber did not lodge a contemporaneous objection. See K.S.A. 60-404 (a verdict shall not be set aside by reason of the erroneous admission of evidence unless opponent of evidence timely objected to it). In addition, the State asserts defense counsel failed to renew the objection made during J.S.'s father's testimony when her mother took the stand. And the State further contends counsel did not object during the bench conference but merely put forth the grounds for expected objections.
For preservation purposes, it is unnecessary to parse the transcript to determine who made what objection when and on what basis. K.S.A. 2016 Supp. 21-6619(b) renders the State's preservation argument meritless. See *435 State v. Kleypas , 305 Kan. 224, 260-62, 382 P.3d 373 (2016) ( Kleypas III ) (noting "long line of cases" recognizing statute codifies court's "forgiving approach to preservation in the context of death penalty appeals"), cert. denied --- U.S. ----, 137 S.Ct. 1381, 197 L.Ed.2d 560 (2017) ; Robinson , 303 Kan. 11, Syl. ¶ 44, 363 P.3d 875 ("The failure to lodge a contemporaneous objection to the admission of evidence typically forecloses subsequent challenge on appeal. However, in capital murder appeals, K.S.A. 21-4627 [b], recodified as K.S.A. 2014 Supp. 21-6619 [b], compels review of any issue raised in defendant's brief, even if not preserved below.").
Turning to the merits, Thurber frames the issue as one involving J.S.'s "good character." Character evidence's admissibility is generally governed by K.S.A. 60-446 and K.S.A. 60-447, and the State cannot show a victim's peaceful reputation until that victim's character is attacked. State v. Collier , 259 Kan. 346, 351, 913 P.2d 597 (1996). But Thurber does not cite this authority. Instead, he challenges the mother's testimony "as to personal details of J.S.'s life, including that she graduated from high school as a valedictorian[ ] and went to college on a dance scholarship." (Emphasis added.) He argues this was irrelevant and prejudicial to both the guilt-phase and penalty-phase verdicts.
A jury is not entitled to know irrelevant personal details about a victim. State v. Donesay , 265 Kan. 60, 84, 959 P.2d 862 (1998) (widow's testimony about personal information of deceased husband "irrelevant, prejudicial, and inflammatory"); see also State v. Henry , 273 Kan. 608, Syl. ¶ 8, 44 P.3d 466 (2002) (victim's mother's testimony and prosecutor's remarks about mother's grief not relevant, patently improper, clearly intended to inflame passion and prejudice of jury, and required reversal of conviction); State v. Carter , 270 Kan. 426, 442, 14 P.3d 1138 (2000) (victim's father's testimony immaterial and inflammatory); State v. Galloway , 268 Kan. 682, 690, 1 P.3d 844 (2000) (irrelevant testimony by victim's sister erroneously admitted, but error harmless). But relevant personal details are certainly admissible under appropriate circumstances. See K.S.A. 60-407(f) (except as otherwise provided by statute, all relevant evidence admissible).
Identity was a disputed material fact. The State's theory had Thurber becoming increasingly interested in dance team members leading up to J.S.'s disappearance. Testimony that she graduated high school and received a dance scholarship to attend Cowley County Community College were facts connected to her team membership. And that membership was probative to Thurber's identity as her killer because it created the permissible inference that Thurber's interest in dance team members materialized into J.S.'s attack. Admittedly there was a shorter path to establishing J.S.'s team membership, but the prosecutor's questioning was permissible to create the "evidentiary depth" necessary "to tell a continuous story." Old Chief v. United States , 519 U.S. 172, 190, 117 S.Ct. 644, 136 L.Ed. 2d 574 (1997).
Thurber also contends this evidence was prejudicial. But nearly all evidence the State presents in a criminal case will be prejudicial against a defendant, so the proper inquiry is whether the risk of unfair or undue prejudice substantially outweighed the evidence's probative value. State v. Seba , 305 Kan. 185, 213, 380 P.3d 209 (2016). This inquiry is reviewed for abuse of discretion. State v. Smith , 299 Kan. 962, 970, 327 P.3d 441 (2014). And on that basis, it is hard to discern any risk of unfair prejudice from these minimal background details. Having already concluded the college dance scholarship evidence was relevant and therefore probative, there was no risk any unfair prejudice could substantially outweigh the evidence's probative value. The additional detail that J.S. was high school valedictorian was extraneous, but not a personal detail that would inflame jury passions or prejudices. The district court did not err.
As to the portrait-style photo, admission of a relevant antemortem photograph of a murder victim is reviewed for abuse of discretion. State v. Hebert , 277 Kan. 61, 100, 82 P.3d 470 (2004). And to be relevant, evidence must be material and probative in nature. "This court reviews materiality de novo and the probative nature of evidence for an abuse of discretion." State v. Longoria , 301 Kan. 489, 517, 343 P.3d 1128 (2015).
*436 J.S.'s photograph was probative of victim identity. State v. Crum , 286 Kan. 145, 159-60, 184 P.3d 222 (2008) (photographs may be admitted for purposes of identifying the victim); State v. Ackward , 281 Kan. 2, 27, 128 P.3d 382 (2006) (predeath photograph of victim probative because it assisted prosecution in proving identity of victim). And the contrast between the antemortem photograph and the postmortem photographs tended to demonstrate the extent of J.S.'s facial injuries. See State v. Walker , 252 Kan. 279, 287, 845 P.2d 1 (1993) (predeath studio photograph of murder victim relevant to show how victim appeared before attack).
Thurber also appears to challenge the photograph's materiality by arguing there "were no issues of identification in this case" and that J.S.'s "identity was never questioned." But the State had to prove all elements of the crime charged, so identity was a material fact. Cf. Longoria , 301 Kan. at 518, 343 P.3d 1128 ("[G]iven that Longoria did not plead guilty, all elements of the charged crimes remained 'in dispute'; his stipulation merely means he did not intend to contest the State's evidence on that particular point of dispute-i.e. , that particular aspect of the State's burden."). The photograph was probative and material, so it was relevant and admissible.
Finally, Thurber makes a bare assertion that the antemortem photograph was unduly prejudicial. But nothing in this record suggests it was more prejudicial than in any other case in which this court approved admission of such photographs. See, e.g., Hebert , 277 Kan. at 103, 82 P.3d 470 (no error in admitting predeath photograph; photograph displayed one time early in trial and not accompanied by inflammatory personal details about victim). The district court did not abuse its discretion by permitting a brief display of J.S.'s photograph.
9. Felony Murder as a Lesser Included Offense
Thurber next claims the district court erred by not sua sponte instructing the jury on felony murder as a lesser included offense of capital murder. This was not error. K.S.A. 2016 Supp. 21-5402(d) provides that felony murder is not a lesser included offense of capital murder, so Thurber is not entitled to relief because the instruction was not legally appropriate. See State v. Cheever , 306 Kan. 760, 770, 402 P.3d 1126 (2017) (retroactive application of statute offends neither due process nor the prohibition against ex post facto laws); State v. Carr , 300 Kan. 1, Syl. ¶ 3, 331 P.3d 544 (2014) (statute forecloses argument that lesser included offense instruction for felony murder is required in capital murder prosecution), rev'd and remanded on other grounds 577 U.S. ----, 136 S.Ct. 633, 193 L.Ed. 2d 535 (2016) ; State v. Gleason , 299 Kan. 1127, 1160-61, 329 P.3d 1102 (2014), rev'd and remanded sub nom. on other grounds Kansas v. Carr , 577 U.S. ----, 136 S.Ct. 633, 193 L.Ed. 2d 535 (2016).
10. Change of Venue
Thurber argues his Sixth Amendment right to an impartial jury was violated when the district court denied his motion to change venue. That motion was filed and ruled on before voir dire, so the district court was never presented with an actual prejudice claim. Thurber does not argue the court had an independent duty to assess actual prejudice based on jury questionnaire responses or voir dire.
10.1 Additional Facts
On March 21, 2008, Thurber moved for a change of venue. He argued prejudicial pretrial publicity permeated the community, giving rise to a presumption of prejudice. In a supplement to the motion, Thurber provided two boxes of newspaper clippings and recordings of television and radio coverage. These are not in the record.
One month later, the district court held a hearing on the motion. The defense called Peter Hamilton, a Pittsburg State University professor, who conducted a defense-commissioned venue study. Hamilton reviewed survey responses from 400 Cowley County residents. He testified 92 percent of respondents were "highly aware" of the case and less than one percent failed to recall it. Hamilton concluded that of those who were aware, many had a "relatively high involvement," i.e., they were paying attention to media coverage and *437 discussing the case with others in the community. The survey indicated 72 percent of respondents had discussed the case with others and nearly 90 percent of respondents felt "very angry about this crime taking place in our community."
Hamilton noted the survey further indicated 87 percent of respondents thought Thurber was guilty and less than one percent thought him innocent. He explained the views held by community members were consistent across several demographics: age, sex, education, and location within the county. Ultimately, Hamilton believed the case should be moved from Cowley County because the potential jury pool was "not a balanced neutral audience." On cross-examination, the prosecutor challenged the survey methodology, including the selection criteria for survey respondents and how certain questions were framed. The venue study was admitted as an exhibit, but it is not in the record.
Following Hamilton's testimony, defense counsel argued media coverage and Cowley County residents' level of involvement required a venue change. Counsel claimed Cowley County residents could not be fair and impartial. In responding to the court's questions, counsel conceded news reports were factual and not inflammatory or intending to influence the trial's outcome. The prosecutor argued media coverage had not created a "circus[-]type arena." The court took the motion under advisement.
On July 7, 2008, the court denied the motion. It recognized the "crimes committed shocked the surrounding communities, and the local media reflected this outrage." But the court concluded these news accounts were factual rather than inflammatory and there was no evidence the media attempted to influence the trial's outcome. In addition, the court concluded the media had not fueled a "relentless hysteria and passion in the community." The court ruled the defense failed to meet its burden to show it would be "virtually impossible to receive a fair trial by impartial jury drawn from Cowley County citizens."
The court informed the defense it could raise the issue again after receiving jury questionnaires or during voir dire if "it becomes reasonably apparent that it may be impossible to get an impartial jury." No further efforts were made to move the trial during the remaining proceedings.
10.2 Standard of Review
A venue challenge under the Sixth Amendment to the United States Constitution based on pretrial publicity can arise in two different contexts: presumed prejudice and actual prejudice. State v. Roeder , 300 Kan. 901, 908-09, 336 P.3d 831 (2014) ; Carr , 300 Kan. at 56-57, 331 P.3d 544 (clarifying differences in analysis between presumed and actual prejudice).
" 'The first context occurs where the pretrial publicity is so pervasive and prejudicial that we cannot expect to find an unbiased jury pool in the community. We "presume prejudice" before trial in those cases, and a venue change is necessary.' [ Goss v. Nelson ,] 439 F.3d [621,] 628 [10th Cir. 2006]. 'In such cases, a trial court is permitted to transfer venue without conducting voir dire of prospective jurors.' House v. Hatch , 527 F.3d 1010, 1023-24 (10th Cir. 2008).
"The second context, 'actual prejudice,' occurs 'where the effect of pretrial publicity manifested at jury selection is so substantial as to taint the entire jury pool.' Goss , 439 F.3d at 628 ; see Gardner v. Galetka , 568 F.3d 862, 888 (10th Cir. 2009). 'In cases of actual prejudice, "the voir dire testimony and the record of publicity [must] reveal the kind of wave of public passion that would have made a fair trial unlikely by the jury that was impaneled as a whole." [Citation omitted.]' Hatch , 527 F.3d at 1024." Carr , 300 Kan. at 57, 331 P.3d 544.
When considering presumed prejudice, a court evaluates seven factors. See Skilling v. United States , 561 U.S. 358, 380-85, 130 S.Ct. 2896, 177 L.Ed. 2d 619 (2010). Described as the Skilling factors, they are:
"(1) media interference with courtroom proceedings; (2) the magnitude and tone of the coverage; (3) the size and characteristics of the community in which the crime *438 occurred; (4) the amount of time that elapsed between the crime and the trial; (5) the jury's verdict; (6) the impact of the crime on the community; and (7) the effect, if any, of a codefendant's publicized decision to plead guilty." Carr , 300 Kan. at 62, 331 P.3d 544 (citing Skilling , 561 U.S. at 381-85, 130 S.Ct. 2896 ).
To warrant a venue change based on presumed prejudice, these seven factors should demonstrate "that publicity has displaced the judicial process entirely or that the courtroom proceedings more resemble a circus or a lynch mob." State v. Longoria , 301 Kan. 489, 506, 343 P.3d 1128 (2015).
A mixed standard of review applies to a presumed prejudice challenge. An appellate court examines the trial court's findings of fact for substantial competent evidence and reviews the ultimate legal conclusion drawn from those facts, i.e., whether to presume prejudice, de novo. Robinson , 303 Kan. at 74-75, 363 P.3d 875.
Actual prejudice occurs when the effect of pretrial publicity manifested at jury selection is so substantial as to taint the entire jury pool. 303 Kan. at 60, 363 P.3d 875. "When faced with a claim of actual prejudice, a trial court must 'review the media coverage and the substance of the jurors' statements at voir dire to determine whether a community-wide sentiment exists against the defendant.' " Longoria , 301 Kan. at 508, 343 P.3d 1128. Negative media attention by itself is insufficient to establish actual prejudice. Carr , 300 Kan. 1, Syl. ¶ 6, 331 P.3d 544. An actual prejudice claim is reviewed for abuse of discretion. Robinson , 303 Kan. at 60, 363 P.3d 875.
An independent statutory basis for venue change also exists under K.S.A. 22-2616(1) (trial court should transfer venue when defendant shows "so great a prejudice against the defendant that he [or she] cannot obtain a fair and impartial trial in that county"). A court considers nine factors when deciding whether community prejudice warrants a venue change under the statute. Robinson , 303 Kan. at 71, 363 P.3d 875.
"Factors to be considered on whether a venue change is necessary under the Kansas statute include: (1) the particular degree to which the publicity circulated throughout the community; (2) the degree to which the publicity or that of a like nature circulated to other areas to which venue could be changed; (3) the length of time which elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the ease encountered in the selection of the jury; (5) the familiarity with the publicity complained of and its resultant effects, if any, upon the prospective jurors or the trial jurors; (6) the challenges exercised by the defendant in the selection of the jury, both peremptory and for cause; (7) the connection of government officials with the release of the publicity; (8) the severity of the offense charged; and (9) the particular size of the area from which the venire is drawn." Carr , 300 Kan. 1, Syl. ¶ 10, 331 P.3d 544.
Denial of a venue change motion under K.S.A. 22-2616(1) is reviewed for abuse of discretion. Longoria , 301 Kan. at 509, 343 P.3d 1128.
10.3 Analysis
Thurber faces a "high burden" to show a venue change was constitutionally mandated as a result of presumed prejudice. Longoria , 301 Kan. at 506, 343 P.3d 1128. His argument is sparse, and he does not reference the Skilling factors. Thurber relies on Hamilton's testimony that 87 percent of respondents thought Thurber was guilty and 90 percent were very angry the crime occurred in their community. He contends these figures "should be sufficient evidence to establish excessive bias." He also notes 11 of 12 jurors heard about the crime before trial, which was consistent with Hamilton's survey finding that 92 percent of respondents were highly aware of the case.
But awareness does not equal impermissible bias absent a " 'trial atmosphere that [was] utterly corrupted by press coverage.' " Skilling , 561 U.S. at 380, 130 S.Ct. 2896 (quoting Murphy v. Florida , 421 U.S. 794, 798, 95 S.Ct. 2031, 44 L.Ed. 2d 589 [1975] ). Juror exposure to news accounts does not, standing alone, presumptively deprive *439 a defendant of due process. Murphy , 421 U.S. at 799, 95 S.Ct. 2031. The Skilling Court explained:
"Prominence does not necessarily produce prejudice, and juror impartiality , we have reiterated, does not require ignorance . Irvin v. Dowd , 366 U.S. 717, 722[, 81 S.Ct. 1639, 6 L.Ed. 2d 751] (1961) (Jurors are not required to be 'totally ignorant of the facts and issues involved'; 'scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.'); Reynolds v. United States , 98 U.S. 145, 155-156[, 25 L.Ed. 244] (1879) ('[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits.'). A presumption of prejudice, our decisions indicate, attends only the extreme case." 561 U.S. at 381, 130 S.Ct. 2896.
On review, only one Skilling factor-the community's size and characteristics-weighs in favor of presumed prejudice. Four factors weigh against it. One factor is inapplicable. And one factor-the jury's verdict-is neutral. It does not undermine Thurber's claim, but it also does not weigh in favor of presumed prejudice.
The first Skilling factor considers media interference with courtroom proceedings. There is no evidence or claim of this, so that weighs against presumed prejudice.
The second factor considers the magnitude and tone of pretrial press coverage. The district court concluded media coverage was factual and not inflammatory. And since no media coverage is in the record, we cannot independently assess it. Thurber's failure to include media coverage he claims prejudiced the community in the appellate record weighs against a presumed prejudice finding.
The third factor looks at the size and characteristics of the community where the crime occurred. Thurber does not tell us Cowley County's population when the motion was heard; nor does he discuss the community's characteristics. But the prosecutor indicated at the motion hearing the population was "roughly 35,000." That number is significantly lower than other jurisdictions in which community size mitigated the potential for presumed prejudice. See Skilling , 561 U.S. at 382, 130 S.Ct. 2896 (4.5 million potential jurors minimized potential for presumed prejudice); Carr , 300 Kan. at 67-68, 331 P.3d 544 (noting Sedgwick County had 452,000 residents and concluding factor did not weigh in favor of presumed prejudice). This factor weighs in favor of presumed prejudice. See Longoria , 301 Kan. at 507, 343 P.3d 1128 (recognizing "relatively small" jury pool of 20,546; holding factor weighed in favor of presumed prejudice).
The fourth factor considers the time between the crime and trial. Two years had passed before Thurber's trial. By the time of the motion hearing, 15 months had passed. In Carr , 17 months had passed between the crimes and the district court's ruling on a venue change motion. The Carr court suggested public interest in the crimes and the defendants typically would have begun to wane during that amount of time and would continue to do so. 300 Kan. at 68, 331 P.3d 544. But the Carr court also noted a defense expert testified about the "staying power of the relevant press coverage and the extreme public opinions it fostered." 300 Kan. at 68, 331 P.3d 544. The Carr court ultimately concluded this factor was "inconclusive on presumed prejudice." 300 Kan. at 68, 331 P.3d 544. In Thurber's case, Hamilton did not testify about the media coverage's staying power against a backdrop of expected dissipation. Absent such testimony, this factor weighs against presumed prejudice.
The fifth factor-the jury's verdict-was not known when the court ruled. And this court has repeatedly held this factor "carries no weight" because the verdict was not known to the district court when the venue change motion was heard. Longoria , 301 Kan. at 508, 343 P.3d 1128 ; see Robinson , 303 Kan. at 76, 363 P.3d 875. But the Skilling Court suggested this was a factor for an appellate court to consider rather than *440 the district court. 561 U.S. at 383-84, 130 S.Ct. 2896. The jury's verdict in Thurber's case does not undermine his presumed prejudice claim, but it also does not weigh in favor of presumed prejudice.
The sixth factor considers the crime's impact on the community. The district court acknowledged the crime "shocked" the community, but there was no evidence suggesting community members took steps independent of discussing the case with others in the community. Cf. Carr , 300 Kan. at 69, 331 P.3d 544 (noting media report indicating an increase in home security systems purchases following media reports of crime). This factor weighs against presumed prejudice.
The seventh factor, which considers publicity given to a codefendant's decision to plead guilty, is inapplicable.
As discussed, only the third factor-the community's size and characteristics-weighs in favor of presumed prejudice. We hold Thurber fails to meet his high burden to demonstrate a venue change was constitutionally required.
Finally, Thurber asserts "[t]here are many statements of bias against the defense" in the jurors' questionnaires. Specifically, he notes one juror said if the jury found the defendant guilty, he would vote for death. And in his reply brief, Thurber identifies three other jurors who stated views favoring the death penalty. But a prospective juror's general views on the death penalty do not relate to the Skilling factors, as they do not tend to demonstrate whether publicity surrounding the case has tainted the jury pool. Moreover, those views of individual venire members were subject to defense questioning during voir dire. The questionnaire responses are noted, but do not assist Thurber's presumed prejudice claim.
We reject Thurber's contention that the trial's venue was constitutionally inappropriate due to presumed prejudice.
11. Lack of Presence when Juror Excused
Thurber argues his constitutional right to be present at all critical stages of his criminal trial was violated when the district court excused a juror who became ill and replaced that juror with the first alternate without advising Thurber. (Thurber Issue 13). He raises this challenge in his penalty-phase briefing, but we consider the matter now because it fits our sequencing.
11.1 Additional Facts
On the morning of the first day of the guilt-phase proceeding, the district court met with defense counsel and the prosecutor in chambers. The record does not reveal if Thurber was present. The court informed the parties a juror was ill and in the hospital, so the court excused the juror and seated the first alternate (A.J.). Thurber did not claim any prejudice from this until his reply brief. The argument goes that since Thurber was not present, the court put the first alternate on the jury without using the procedure set out in K.S.A. 22-3412(c) (by drawing the name of the alternate), and A.J. held death penalty views "highly unfavorable to the defense."
11.2 Standard of Review
A claim a defendant was deprived of the statutory and constitutional rights to be present during trial raises legal questions subject to unlimited review. State v. Killings , 301 Kan. 214, 239, 340 P.3d 1186 (2015). Statutory interpretation is also a question of law over which appellate courts have unlimited review. State v. Jeffries , 304 Kan. 748, 751, 375 P.3d 316 (2016).
11.3 Analysis
A criminal defendant has a constitutional and statutory right to be present at all critical stages of the trial. See United States v. Gagnon , 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed. 2d 486 (1985) ; Killings , 301 Kan. at 240, 340 P.3d 1186. The constitutional right is rooted in the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. Gagnon , 470 U.S. at 526, 105 S.Ct. 1482. The statutory right derives from K.S.A. 22-3405(1), which provides:
"The defendant in a felony case shall be present at the arraignment, at every stage *441 of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law. In prosecutions for crimes not punishable by death , the defendant's voluntary absence after the trial has been commenced in such person's presence shall not prevent continuing the trial to and including the return of the verdict." (Emphasis added.)
This court has interpreted K.S.A. 22-3405(1) to mean:
"[A] felony defendant must be present at any stage of the trial when the jury is in the courtroom or when the defendant's presence is essential to a fair and just determination of a substantial issue. The statutory command of K.S.A. 22-3405(1) is analytically and functionally identical to the requirements under the Confrontation Clause and the Due Process Clause of the federal Constitution that a criminal defendant be present at any critical stage of the proceedings against him or her." State v. Engelhardt , 280 Kan. 113, Syl. ¶ 2, 119 P.3d 1148 (2005).
The in-chambers discussion about an ill juror's dismissal prior to opening statements has some markings of a critical stage. See State v. Minski , 252 Kan. 806, 816, 850 P.2d 809 (1993) (defendant had right to be present when district court spoke ex parte with juror who fainted during presentation of evidence and was excused; error harmless). But in State v. Calderon , 270 Kan. 241, 244-45, 13 P.3d 871 (2000), this court concluded that a defendant's right to be present was not violated when the district court judge received a call from an ill juror and replaced the juror with an alternate.
K.S.A. 22-3412(c) provides that "if any regular juror shall be discharged from jury service in any such action prior to the jury reaching its verdict, the court shall draw the name of an alternate juror who shall replace the juror so discharged ...." The record indicates the district court selected the first alternate juror rather than conducting a drawing between the alternate jurors; but Thurber does not suggest this procedure would have been followed had he been present.
There are at least three problems with Thurber's issue. First, it is not explained how Thurber's presence would have impacted what happened. Second, during voir dire the defense passed A.J. for cause, so there was no consequence to her selection. Third, the judge in Thurber's case did not speak directly to the juror, so this is different than in Minski . For these reasons, we will simply assume error, but deem it harmless.
GUILT-PHASE CUMULATIVE ERROR
Thurber does not advance a guilt-phase cumulative-error argument, but we consider cumulative error at this juncture anyway. See Kleypas III , 305 Kan. at 345-46, 382 P.3d 373 (defendant failed to raise a guilt-phase cumulative-error argument, but this court conducted the inquiry under K.S.A. 2015 Supp. 21-6619 [b] and concluded cumulative error did not infect the guilt phase).
We have identified these guilt-phase errors: (1) the Atteberry statement's admission; (2) prosecutorial error-specifically statements that: (a) strangulation could have lasted 12 minutes; (b) J.S. was unfamiliar with the area where she was taken; (c) J.S. was strangled with her leotard; (d) Thurber's ejaculation on the car passenger seat; (e) the Attorney General tapped the prosecutor on the shoulder; and (f) premeditation "[c]an be instantaneous"; (3) the in-court witness identification; and (4) excusing a juror for illness on the first day of the guilt-phase proceeding.
Standard of Review
" 'Cumulative trial errors, when considered collectively, may require reversal of the defendant's conviction when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial.' " Kleypas III , 305 Kan. at 345, 382 P.3d 373.
Analysis
As noted previously, each individual guilt-phase error was harmless standing alone given each error's nature and the strength of the evidence against Thurber. We are equally confident-beyond a reasonable *442 doubt-that the combined effect of the errors would not have changed the jury's guilty verdicts given the overwhelming evidence of guilt. See State v. Carter , 305 Kan. 139, 166, 380 P.3d 189 (2016) (no prejudicial error may be found under cumulative error doctrine if evidence against defendant is overwhelming).
No guilt-phase error amplified the prejudicial effect of any other error. We hold cumulative error did not substantially prejudice Thurber or deny him a fair trial during the guilt-phase proceedings. We affirm Thurber's convictions.
PENALTY PHASE
Before addressing other penalty-phase issues, we consider first Thurber's claim the district court erred by denying his presentencing request for a hearing on whether he was intellectually disabled (Thurber Issue 17) and a related claim attacking the statutory test for making such decisions (Thurber Issue 23). We do so because both the United States Constitution and Kansas statutes forbid executing a capital murder defendant who is intellectually disabled. See Atkins v. Virginia , 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed. 2d 335 (2002) (execution of intellectually disabled individual violates Eighth Amendment's prohibition against cruel and unusual punishment); K.S.A. 2016 Supp. 21-6622(f) (district court cannot impose a death sentence on a capital defendant whom the court determines to be intellectually disabled). Answering these questions could render moot most, if not all, remaining issues in Thurber's case. "Generally, Kansas appellate courts do not decide moot questions or render advisory opinions." State v. Montgomery , 295 Kan. 837, 840, 286 P.3d 866 (2012).
17. The Requested Atkins Hearing, re: Intellectual Disability
Thurber claims the trial court erred by refusing to hold "an Atkins hearing" to determine if he was intellectually disabled. Thurber asserts the evidence from his 2009 penalty-phase proceeding demonstrated he was entitled to a full hearing under the statutory two-step analytical process a district court must use to address a defendant's claim of intellectual disability. See K.S.A. 2016 Supp. 21-6622. To assess such claims, the district court must first decide whether there is sufficient reason to believe the defendant is a person with an intellectual disability. If sufficient reason exists, the court must appoint medical professionals, order the defendant's examination, and conduct a full evidentiary hearing at which the defendant is entitled to present evidence and to cross-examine witnesses. See K.S.A. 2016 Supp. 21-6622. Thurber argues the district court erred at the first step when it found there was insufficient reason to believe he was intellectually disabled.
At the outset, we note for clarity that at the time of the district court proceedings, Kansas sentencing statutes used the term "mentally retarded" instead of "intellectual disability." Compare K.S.A. 2016 Supp. 21-6622, with K.S.A. 21-4623. After this appeal was docketed, legislation made the change in terminology. L. 2012, ch. 91, §§ 1, 16. Variations of both designations are referred to as necessary to give context for the facts and address the parties' arguments.
17.1 Additional Facts from Trial
During the penalty phase in February 2009, Thurber included among his claimed mitigating circumstances "a history of mental illness, maladjustment and behavioral control problems." To support this, he presented expert testimony from Robert Barnett, Ph.D., and three documents: (1) Defense Exhibit A, Admission Evaluation, dated June 9, 2004, from the Cowley County Mental Health and Counseling Center, authored by Frances A. Browning, licensed psychologist; (2) Defense Exhibit B., Initial Psychiatric Evaluation, dated July 21, 2004, from the Cowley County Mental Health and Counseling Center, authored by Richard Wallace, D.O.; and (3) Defense Exhibit C, Discharge Plan Form, dated June 28, 2005, from the Cowley County Mental Health and Counseling Center, authored by Mark Brown, LCMFT, and Wallace, acting as the Center's medical director. These exhibits were part of Barnett's evaluation. Thurber also touched on this theme when his family testified. Notably, Thurber did not claim intellectual disability as a mitigator, *443 and neither the testimony nor the exhibits referred to him as intellectually disabled or mentally retarded.
After the jury unanimously imposed a death sentence, the district court set sentencing for March 20, 2009. Late on March 19, Thurber filed a two-page Motion to Determine Mental Retardation Pursuant to K.S.A. 21-4623. This motion asked for the full evidentiary hearing before sentencing could proceed to decide whether Thurber was mentally retarded. See K.S.A. 21-4623(e) (" '[M]entally retarded' means having significantly subaverage general intellectual functioning, as defined by K.S.A. 76-12b01... to an extent which substantially impairs one's capacity to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law."); K.S.A. 76-12b01(i) (defining " '[s]ignificantly subaverage general intellectual functioning' "). The motion recited no factual basis for the claim that Thurber was intellectually disabled. Indeed, it did not even allege he was intellectually disabled. The district court heard the motion the next day before sentencing.
At that hearing, the district court confirmed its first step was the threshold decision on whether there was "sufficient reason to believe" Thurber was intellectually disabled. See K.S.A. 21-4623(a). Under the statute, that finding was necessary before ordering further psychiatric or psychological evaluations and a full hearing under K.S.A. 21-4623(b). The court asked defense counsel if Thurber had any argument or evidence concerning this threshold question. Counsel responded:
"Only argument I have, Your Honor, is there was some evidence presented throughout trial in the second stage regarding his low mental functioning. There is evidence, I believe, I think presented testing showing that he tests somewhere in the 70's as far as I.Q. We think that there makes it such that the Court should take this issue up now at this point in time.
"Statute says we may make that request after he's been convicted. We think this would be the appropriate time for the Court to do this, make this determination now as opposed to coming along sometime later on. We make our request. We do not have any evidence further than what has been presented, but we rely on that at this point ." (Emphasis added.)
The court asked for the State's response. The State first argued Thurber's motion was untimely. The court rejected that and asked the State to address the merits.
The State emphasized Barnett had testified, "I want to make it clear I do not say [Thurber] is mentally retarded." The State observed Barnett had not diagnosed Thurber as mentally retarded under the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, DSM-IV. It then referenced: (1) Defense Exhibit A, which assessed Thurber as "smart," capable of completing college, and having an average IQ, and which did not reflect a mental retardation diagnosis in DSM-IV, Axis II; (2) State's Exhibit 1, Thurber's high school transcript showing Thurber graduated high school with a 2.5 grade point average; (3) State's Exhibit 2, Thurber's college transcript showing he completed 64 credit hours with a 2.1 GPA; (4) Thurber's failure to argue he was substantially impaired from appreciating the criminality of his conduct or from conforming his conduct to the requirements of law as a mitigator under K.S.A. 21-4626(6) ; (5) evidence Thurber communicated effectively with law enforcement while in custody and in letters demonstrating his communication ability; and (6) an evaluation admitted at Thurber's competency hearing that did not reflect a mental retardation diagnosis in DSM-IV, Axis II.
The district court ruled from the bench. The judge expressly referenced his consideration of all pretrial hearings and motions, explaining:
"The evidence in this case, which I believe for this particular motion [the] Court can consider, hearing on pretrial motions, the guilt phase, the sentencing phase, anything that was admitted into evidence. The evidence has shown that the defendant graduated from high school. I don't have that transcript right in front of me, but I'll rely on [the prosecutor's] assertion that he had [a] 2.5 GPA. He went to two years of junior college, 64 credit hours, 2.1 GPA. Without disparaging, Cowley College is not *444 Harvard University, I would think that it would take at least a certain degree of intelligence to obtain 64 hours of credit, and a 2.1 GPA.
"Evidence has shown that he had a driver's license. You have to take a written test to get a driver's license. He worked at Kentucky Fried Chicken and Subway, did part-time work as [a] bail bondsman.
"Court viewed the videotaped interview the defendant did with Agent Atteberry. During that interview, the defendant demonstrated [an] ability to understand questions propounded to him and to respond in [an] understandable and intelligent fashion. He showed an ability to offer a version of events that seemed to be consistent with the eyewitness testimony.
"There was evidence that he went to parties and associated with friends who were around his same age. None of his associates who testified indicated anything that suggested the defendant is mentally retarded. The defendant was examined at Larned State Hospital. And while the specific issue of mental retardation may not have been addressed in that evaluation, the overall tenor of that record would not suggest that he was mentally retarded.
"A psychiatric evaluation performed by Dr. Wallace on July [21], 2004, which that court report was admitted into evidence, it stated he, meaning Mr. Thurber, appears to be a smart individual, capable of completing college as well as obtaining employment that would sustain his financial needs. Same report further stated if the defendant had a 2.65 GPA in high school-that is not consistent with the transcript. Apparently that must have been defendant's self-reporting, his GPA-I'm not sure why there is that discrepancy.
"The report went on to say that he, Mr. Thurber, definitely did not show any psychiatric retardation, Frances Browning's admission evaluation dated June 9th, 2004, she said his I.Q. is estimated to be within the average range. Dr. Barnett, witness for the defendant at the sentencing stage said 'I want to make it clear, I do not say he's mentally retarded.'
"Mental retardation is defined at K.S.A. [76-12b01] subsection [d], as in dog, the first clause of that definition says mental retardation means significantly subaverage general intelligent function. It doesn't say below average. It says significantly subaverage. Statute K.S.A. 21-4623 ( [a] ) is somewhat vague on the quantum of proof necessary for the Court to make an initial determination that there is sufficient reason to believe that defendant is mentally retarded. It doesn't say [the] Court must find a reasonable belief or, excuse me, a prima faci[e] case. Doesn't say what the quantum of proof [is]. It simply says the Court should determine whether there is sufficient reason to believe he's mentally retarded.
"While that is a vague concept, it would stand to reason that something more is needed than the [bald] assertion that defendant is mentally retarded. The Court finds that there is not sufficient reason to believe the defendant is mentally retarded and, therefore, [he] should be sentenced in accordance with K.S.A. 21-4624 through 21-4627, 21-4629 and 21-4631."
17.2 Statutes Applicable at the Time of the Hearing
In March 2009, when Thurber's motion was heard, K.S.A. 21-4623(e) provided: "As used in this section, 'mentally retarded' means having significantly subaverage general intellectual functioning, as defined by K.S.A. 76-12b01 and amendments thereto, to an extent which substantially impairs one's capacity to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law." The reference to K.S.A. 76-12b01 is to a set of definitions used in a more comprehensive act generally relating to state institutions for the intellectually disabled. Subsection (i) at that time defined " '[s]ignificantly subaverage general intellectual functioning' " as "performance which is two or more standard deviations from the mean score on a standardized intelligence test specified by the [secretary of social and rehabilitation services or the designee of the secretary]."
*445 17.3 Constitutional Standards Applicable at Time of the Hearing
In 2002, almost seven years before Thurber's trial, the United States Supreme Court decided Atkins v. Virginia , 536 U.S. 304, 122 S.Ct. 2242. There were two main holdings: (1) executing a mentally retarded individual is categorically prohibited by the Eighth Amendment because it constitutes cruel and unusual punishment, overruling Penry v. Lynaugh , 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed. 2d 256 (1989), which reached the opposite conclusion based on a then-perceived lack of a national consensus; and (2) states would be left to develop appropriate criteria for enforcing this constitutional restriction because "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." Atkins , 536 U.S. at 317, 321, 122 S.Ct. 2242 ("Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.").
Kansas statutes were referenced in Atkins . The majority cited the 1994 amendment of K.S.A. 21-4623 as evidence that Kansas had joined the ranks of states since Penry prohibiting execution of mentally retarded persons. 536 U.S. at 314, 122 S.Ct. 2242. And in a dissenting opinion, Justice Antonin Scalia noted the Kansas definition of "mentally retarded" and observed: "Kansas apparently permits execution of all except the severely mentally retarded." 536 U.S. at 342-43, 122 S.Ct. 2242 (Scalia, J., dissenting). In a footnote, he explained:
"The Kansas statute defines 'mentally retarded' as 'having significantly subaverage general intellectual functioning ... to an extent which substantially impairs one's capacity to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law.' Kan. Stat. Ann. § 21-4623(e) (2001). This definition of retardation, petitioner concedes, is analogous to the Model Penal Code's definition of a 'mental disease or defect' excusing responsibility for criminal conduct, see ALI, Model Penal Code § 4.01 (1985), which would not include mild mental retardation. [Citation omitted.]" 536 U.S. at 343 n.2, 122 S.Ct. 2242 (Scalia, J., dissenting).
Justice Scalia's observation would foreshadow Thurber's challenge in Issue 23 attacking the Kansas statutory test that defines intellectual disability so restrictively, i.e., requiring significantly subaverage general intellectual functioning "to an extent which substantially impairs one's capacity to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law." K.S.A. 21-4623(e).
17.4 Later Developments
In 2010, the Kansas Legislature repealed K.S.A. 21-4623 and enacted K.S.A. 21-6622 in its place. See L. 2010, ch. 136, §§ 262, 307. The statute's text remained largely unchanged. The previously noted 2012 amendment substituted the term "intellectual disability" for "mentally retarded" throughout. See L. 2012, ch. 91, § 16. The statutory test for determining whether a criminal defendant had an "intellectual disability" continued to rely, in part, on K.S.A. 76-12b01(i), which remained unchanged.
In early 2014, this court decided State v. Maestas , 298 Kan. 765, 785, 316 P.3d 724 (2014), in which we considered the definition of "mentally retarded" in the context of K.S.A. 21-4634(f), a statute employing the same definition for that term in a non-death penalty criminal context. We held that under K.S.A. 21-4634(f)"evidence that a defendant's IQ is greater than 70 is sufficient to support a finding that the defendant does not possess significantly subaverage general intellectual functioning" and is therefore not mentally retarded for sentencing purposes. 298 Kan. at 787, 316 P.3d 724. To justify that conclusion, we cited K.S.A. 76-12b01(i) (defining significantly subaverage general intellectual functioning as scoring two standard deviations from the mean on a standardized IQ test) and Penry , 492 U.S. at 308 n.1, 109 S.Ct. 2934 (reciting definition of mental retardation, including " 'significantly subaverage general intellectual functioning' " and stating " '[t]o be classified as mentally retarded, a person generally must have an IQ of 70 or below' "), abrogated on other *446 grounds by Atkins , 536 U.S. 304, 122 S.Ct. 2242. Maestas , 298 Kan. at 787, 316 P.3d 724.
A few months after Maestas , the United States Supreme Court decided Hall , which limited how "intellectual disability" could be defined by the states to implement the Atkins holdings and principles. At issue was the Florida Supreme Court's narrow interpretation of Florida law that a person whose IQ test score was above 70, including a score within the margin of measurement error, did not have an intellectual disability and was barred from presenting other evidence showing that person's faculties were limited, i.e., adaptive deficits. Hall , 134 S.Ct. at 1994. As the Court majority explained:
"Florida's rule disregards established medical practice in two interrelated ways. It takes an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence. It also relies on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise." 134 S.Ct. at 1995.
While acknowledging Atkins did not provide definitive procedural or substantive guidelines for the states to use to determine when a person claiming mental retardation fell within Eighth Amendment protections, Hall proclaimed there were nonetheless limitations on the states. 134 S.Ct. at 1998 (" Atkins did not give the [s]tates unfettered discretion to define the full scope of the constitutional protection."). It further noted, "The clinical definitions of intellectual disability, which take into account that IQ scores represent a range, not a fixed number, were a fundamental premise of Atkins . And those clinical definitions have long included the [standard error of measurement]." 134 S.Ct. at 1999.
The Hall Court explained, "The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework ." (Emphasis added.) 134 S.Ct. at 2000. It then said it agreed with the medical experts and held, "[W]hen a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits ." (Emphasis added.) 134 S.Ct. at 2001.
Kansas law once again drew attention in the United States Supreme Court's decision. The Hall Court characterized K.S.A. 2013 Supp. 76-12b01(i) as a definitional statute that "could be interpreted to provide a bright-line cutoff leading to the same result that Florida mandates in its cases ." (Emphasis added.) 134 S.Ct. at 1996. Having said that, the Court majority acknowledged that even though the Kansas statute might be so interpreted, it would not necessarily be so interpreted. 134 S.Ct. at 1996.
In 2016, the Legislature amended K.S.A. 76-12b01(i) to provide:
" 'Significantly subaverage general intellectual functioning' may be established by performance which is two or more standard deviations from the mean score on a standardized intelligence test specified by the secretary. Such standardized intelligence test shall take into account the standard error of measurement, and subaverage general intellectual functioning may be established by means in addition to standardized intellectual testing . The amendments made to this subsection by this act shall be construed and applied retroactively ." (Emphasis added.) K.S.A. 2016 Supp. 76-12b01(i).
See L. 2016, ch. 108, § 1.
Legislative history indicates the 2016 amendments were motivated by the cautionary reference in Hall . See Legislative Research Department Supplemental Note on Senate Bill No. 375 (testimony by Attorney General's office that bill to amend statute intended to respond to Hall ). And K.S.A. 2016 Supp. 76-12b01(i), by its express terms, is consistent with Hall 's treatment-at least as to the first component of the clinical definition for assessing an intellectual disability as recited in Hall and Atkins . See Hall , 134 S.Ct. at 1994 ; Atkins , 536 U.S. at 318, 122 S.Ct. 2242.
*447 In 2017, the United States Supreme Court issued its decision in Moore . Its significance lies in its holding that current medical standards would further restrict a state's discretion in defining intellectual disability for purposes of enforcing the Eighth Amendment categorical prohibition on executing the intellectually disabled. 137 S.Ct. at 1053. Moore meaningfully informs our analysis for Thurber's claims.
Procedurally, Moore was an appeal from a habeas corpus proceeding initiated 30 years after Moore was sentenced to death in Texas. In the habeas action, Moore claimed he was intellectually disabled and therefore ineligible for the death penalty under the Eighth Amendment. Moore , 137 S.Ct. at 1045. A habeas court agreed with him, applying a definition of intellectual disability based on then-current medical standards, including those for evaluating both IQ scores and adaptive functioning measures. 137 S.Ct. at 1046. But the Texas Court of Criminal Appeals denied habeas relief, holding Moore failed to prove significantly subaverage intellectual functioning because he achieved IQ test scores of 74 and 78. Further, the Texas high court concluded, Moore failed to prove " 'significant and related limitations' " in adaptive functioning based on additional restrictions imposed by Texas caselaw, so his claim nevertheless would fail. 137 S.Ct. at 1046-48. The United States Supreme Court vacated the judgment and remanded the case.
In reaching its result, the Moore Court held the Texas high court had "fastened" its intellectual-disability determination to an outdated definition of intellectual disability adopted in that state's earlier court rulings and that this archaic definition "pervasively infected" the state court analysis such that "the decision of that court cannot stand." 137 S.Ct. at 1053. The Moore Court explained that the Texas court's analysis of Moore's IQ scores was "irreconcilable with Hall " because it failed to account for the standard error of measurement; and because Moore had an IQ of 74, when adjusted for the standard error of measurement he had an IQ range of 69-79. This meant the lower end of the range fell below 70, so the Texas court was required under Hall to consider Moore's adaptive functioning. 137 S.Ct. at 1049.
Then, addressing the Texas court's treatment of adaptive functioning criteria, the Court expanded on its earlier rationale from Hall in noting: "By rejecting the habeas court's application of medical guidance and clinging to the standard it laid out in [an earlier case], including [that case's] wholly nonclinical ... factors, the [Texas court] failed adequately to inform itself of the 'medical community's diagnostic framework[ ]'.... " (Emphasis added.) 137 S.Ct. at 1053. The Texas court was required to reconsider its decision in this new light. 137 S.Ct. at 1053.
17.5 Standard of Review for Thurber's Motion
This court has not previously considered in a death penalty case the standard to apply when reviewing a district court's threshold "reason-to-believe" finding under K.S.A. 21-4623(a), recodified as K.S.A. 2016 Supp. 21-6622(a). But we have considered the standard of review under parallel statutory language contained in K.S.A. 21-4634, which precludes a district court from imposing upon a defendant who is intellectually disabled any mandatory term of imprisonment for premeditated first-degree murder. See K.S.A. 21-4634(e) (generally, provisions of K.S.A. 21-4634 do not apply if it is determined under K.S.A. 21-4623 that defendant is not mentally retarded). In State v. Backus , 295 Kan. 1003, 1015, 287 P.3d 894 (2012), we held an abuse of discretion standard should apply when reviewing a district court's reason-to-believe ruling under K.S.A. 21-4634 because "the trial judge is in a superior position to make that determination after observing and listening to the defendant." And we recently applied an abuse of discretion standard under K.S.A. 2015 Supp. 21-6622(b) using the same rationale in State v. Corbin , 305 Kan. 619, 622, 386 P.3d 513 (2016).
Because of the similarities between K.S.A. 21-4623 and K.S.A. 21-4634, we hold that the abuse of discretion standard is appropriate for Thurber's appeal. Judicial discretion is abused if judicial action is: (1) arbitrary, fanciful, or unreasonable, i.e., if no reasonable *448 person would have taken the view adopted by the trial court; (2) based on an error of law, i.e., if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, i.e., if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. Maestas , 298 Kan. at 785, 316 P.3d 724.
Finally, we note K.S.A. 21-4623 is silent as to who generally bears the burden in the district court of proving whether a defendant is intellectually disabled, but we need not address that aspect of the statute now. On appeal, our caselaw places the burden on Thurber to demonstrate error by the district court in ruling on his motion. See Corbin , 305 Kan. at 622, 386 P.3d 513 (citing State v. Schow , 287 Kan. 529, 541, 197 P.3d 825 [2008] ).
17.6 Discussion
In 1972, the Kansas death penalty statute was rendered unconstitutional by the United States Supreme Court's decision in Furman v. Georgia , 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed. 2d 346 (1972). State v. Randol , 212 Kan. 461, 470, 513 P.2d 248 (1973). When the Legislature established the crime of "capital murder" and reinstituted the death penalty in 1994, Kansas statutes protected the intellectually disabled from death sentences and provided procedural and substantive guides for implementing that protection. See L. 1994, ch. 252, §§ 1, 3, 8; see also K.S.A. 2016 Supp. 21-6622. In 2002, as previously noted, the United States Supreme Court held execution of an intellectually disabled individual is categorically prohibited by the Eighth Amendment to the United States Constitution because it constitutes cruel and unusual punishment. Atkins , 536 U.S. at 321, 122 S.Ct. 2242.
What has been in flux since 2002 is the test used to decide when a criminal defendant exposed to the death penalty is intellectually disabled. See Moore , 137 S.Ct. at 1053 ; Hall , 134 S.Ct. at 2001. An obvious initial problem in Thurber's appeal is deciding what law governs our review of whether the district court abused its discretion in 2009 when making its reason-to-believe ruling because the law has changed so profoundly in the intervening time.
Granted, it may seem to some counterintuitive to apply new judicially created rules and legislatively enacted statutes when reviewing a prior court proceeding, but the law requiring us to do so is clear and well-settled-new rules for conducting criminal prosecutions generally apply to cases pending on direct review or not yet final. State v. Berry , 292 Kan. 493, Syl. ¶ 7, 254 P.3d 1276 (2011) ("A new rule for conducting criminal prosecutions is to be applied to all cases, state or federal, pending on direct review or not yet final. A conviction generally is not considered final until [1] the judgment of conviction is rendered; [2] the availability of an appeal is exhausted; and [3] the time for any rehearing or final review has passed."); see also State v. Boggs , 287 Kan. 298, 305-06, 197 P.3d 441 (2008) (holding new rule in criminal prosecutions is applied to cases pending on direct review or not final); State v. Francis , 282 Kan. 120, 126-27, 145 P.3d 48 (2006) (applying new United States Supreme Court precedent on search and seizure to permit admission of evidence); Gaudina v. State , 278 Kan. 103, 106, 92 P.3d 574 (2004) (noting adoption of rule set out in Griffith v. Kentucky , 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed. 2d 649 [1987] ).
Thurber's case is pending on direct review, so we must apply current constitutional standards when reviewing the district court's 2009 determination. See Berry , 292 Kan. 493, Syl. ¶ 7, 254 P.3d 1276. In other words, we need to look to both Moore and Hall in deciding the Eighth Amendment component to Thurber's appeal. The same holds true for our state statutes providing the procedural and substantive framework that implements the Eighth Amendment principles in question. See Corbin , 305 Kan. at 625, 386 P.3d 513 (assuming without deciding K.S.A. 2016 Supp. 76-12b01 [i] would be applied retroactively); State ex rel.Secretary of SRS v. Bohrer , 286 Kan. 898, 904, 189 P.3d 1157 (2008) ("When an applicable statute is amended while an appeal is pending, and counsel for both sides have had an opportunity to brief and argue the amended statute, *449 the appellate court will consider and construe the amended version of the statute.").
Neither party challenges whether this court should apply the 2016 amendment to K.S.A. 76-12b01(i) in deciding Thurber's appeal. The statute plainly states, "[T]his act shall be construed and applied retroactively ." (Emphasis added.) And while the Legislature's power to declare a statute retroactive is not unlimited, absent a claim that retroactive application offends the federal or state Constitutions, the Legislature's plain statement of retroactivity should control. See State v. Todd , 299 Kan. 263, 276, 323 P.3d 829 (2014). Neither party claims a constitutional infirmity would result by this statute's retroactive application.
We hold that our review is governed by current constitutional standards and statutes. This turns our focus on defining intellectual disability, which presents two other obvious problems in reconciling statutory criteria with current federal caselaw.
First, the 2016 amendment providing that "subaverage general intellectual functioning may be established by means in addition to standardized intellectual testing " (emphasis added) does not expressly encompass Hall 's minimum requirement that courts making intellectual disability determinations consider deficits in adaptive functioning, i.e., the inability to learn basic skills and adjust behavior to changing circumstances. Hall , 134 S.Ct. at 1994, 2001. At best, it is unclear in the death penalty context whether the phrase "means in addition to standardized intellectual testing" includes deficits in adaptive behavior as considered by the medical community in its clinical definition. And we note part of the K.S.A. 2016 Supp. 76-12b01 definition of "intellectual disability" used in noncriminal contexts includes explicit references to adaptive behavior. See, e.g., K.S.A. 2016 Supp. 76-12b01(a), (d) (defining " '[i]ntellectual disability' " as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior" and defining " '[a]daptive behavior' " as "the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of that person's age, cultural group and community").
Second, as Justice Scalia observed in 2002, K.S.A. 2016 Supp. 21-6622(h) restrictively defines "intellectual disability" to mean "having significantly subaverage general intellectual functioning ... to an extent which substantially impairs one's capacity to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law ." (Emphasis added.) Cf. K.S.A. 21-4623(e) (defining "mentally retarded" in identical terms). This italicized phrase modifies and narrows the criteria for assessing an intellectual disability, i.e., "significantly subaverage general intellectual functioning." And it does so in a manner that, as we will discuss, is inconsistent with United States Supreme Court precedent for Eighth Amendment compliance in death penalty cases. See Hall , 134 S.Ct. at 1998 (" Atkins did not give the [s]tates unfettered discretion to define the full scope of the constitutional protection."); Moore , 137 S.Ct. at 1053 (state court "failed adequately to inform itself of the 'medical community's diagnostic framework' ").
These problems lead us to consider now Thurber's Issue 23 arguments challenging these aspects of the statutes because the parties' arguments are relevant to identifying the contours of the law governing the district court's intellectual disability ruling, including the threshold reason-to-believe determination. Thurber claims the statutes conflict with constitutional standards because: (1) the statutory definitions in K.S.A. 76-12b01(i), as it existed when Thurber was sentenced and incorporated by reference in K.S.A. 21-4623(e), created a bright-line rule that an IQ score of above 70 disqualified a person from being considered intellectually disabled and made no provision for considering adaptive functioning; and (2) K.S.A. 2016 Supp. 21-6622(h) unconstitutionally limited the death penalty defendants who can qualify for exclusion from the death penalty because of the incapacity restriction. Thurber argues there is no way he can prove he is intellectually disabled in compliance with the Eighth Amendment under Kansas law.
*450 The State takes the conclusory position that the statutes pass constitutional muster, but it is hard to square some of these provisions with the federal caselaw. The United States Supreme Court has made it clear in death penalty cases that states cannot restrict an individual's qualification as intellectually disabled by using IQ test score cutoffs without regard to a test's margin of error adjustments and adaptive functioning when those scores fall below a certain range. Hall , 134 S.Ct. at 2000. And the Court has similarly made it clear states cannot use outdated medical standards, or ignore current ones, because these adjudications must be " 'informed by' " the medical community's current consensus reflecting its improved understanding of intellectual disability over time. Moore , 137 S.Ct. at 1044.
We agree in part with Thurber that K.S.A. 2016 Supp. 21-6622(h) runs afoul of Moore and Hall . It does so by limiting the federal Eighth Amendment protection against execution for this class of individuals to only those whose "significantly subaverage general intellectual functioning" substantially impairs their capacity to appreciate the criminality of their conduct or to conform their conduct to the requirements of law without regard to whether current medical standards would rely on that criterion. In other words, since the medical community does not treat capacity to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law as conclusively demonstrating the absence of an intellectual disability, Kansas cannot statutorily require courts to disregard other relevant medical standards. See Moore , 137 S.Ct. at 1053 (state court "failed adequately to inform itself of the 'medical community's diagnostic framework' "); Hall , 134 S.Ct. at 2000 (Florida violated Eighth Amendment by disregarding established medical practice).
K.S.A. 2016 Supp. 21-6622(h) is further suspect as to this statutory limitation because it applies to death penalty defendants, but not to noncriminal individuals when making intellectual disability determinations for noncriminal purposes. Cf. K.S.A. 2016 Supp. 76-12b01(d) (defining "intellectual disability" for noncriminal purposes). Put simply, we cannot discern how this incapacity limitation safeguards Kansans' Eighth Amendment rights, and the State provides no justification for applying a different standard in the death penalty context. See, e.g., Moore , 137 S.Ct. at 1052 ("Texas cannot satisfactorily explain why it applies current medical standards for diagnosing intellectual disability in other contexts, yet clings to superseded standards when an individual's life is at stake."). Notably, our research has been unable to identify a significant number of other states that so restrictively limit persons with intellectual disabilities in their death penalty's application. This suggests the lack of a national consensus for such a practice. See Atkins , 536 U.S. at 314, 122 S.Ct. 2242.
Given that K.S.A. 2016 Supp. 21-6622(h) suffers from a constitutional infirmity, we must address Thurber's argument that this court cannot construe the statute to meet constitutional requirements. We disagree. On several occasions, this court has considered severing a provision from a statute if doing so would constitutionally allow the remaining provisions to fulfill the statute's purpose. State ex rel. Morrison v. Sebelius , 285 Kan. 875, 913, 179 P.3d 366 (2008) ; see also Thompson v. KFB Ins. Co. , 252 Kan. 1010, 1023, 850 P.2d 773 (1993) (court will assume severability if unconstitutional part can be severed without doing violence to legislative intent); State v. Carpenter , 231 Kan. 235, 240-41, 642 P.2d 998 (1982) (striking phrase from statute as unconstitutionally vague); Gumbhir v. Kansas State Board of Pharmacy , 228 Kan. 579, 588, 618 P.2d 837 (1980) (striking phrase from statute that unlawfully delegated legislative power).
In Gannon v. State , 304 Kan. 490, 518, 372 P.3d 1181 (2016), this court noted that severing unconstitutional language must be approached with caution to avoid the risk of judicially altering the statute in a way that would give it an effect altogether different from the original enactment. But we also recognized appropriate instances when severance may properly be employed as a judicial remedy. 304 Kan. at 519, 372 P.3d 1181. Sixty years ago, we adopted a two-part test to ensure judicial boundaries are maintained.
*451 Felten Truck Line v. State Board of Tax Appeals , 183 Kan. 287, 300, 327 P.2d 836 (1958). In Gannon , we restated the Felten Truck Line test to improve its readability as follows:
"The test for severability in Kansas is well established: Whether the court may sever an unconstitutional provision from a statute and leave the remainder in force and effect depends on the intent of the legislature. If from examination of a statute it can be said that (1) the act would have been passed without the objectionable portion and (2) if the statute would operate effectively to carry out the intention of the legislature with such portion stricken, the remainder of the valid law will stand. This court will assume severability if the unconstitutional part can be severed without doing violence to legislative intent." Gannon , 304 Kan. 490, Syl. ¶ 8, 372 P.3d 1181.
We are aided in today's severability analysis by the Legislature's 2016 amendments to K.S.A. 76-12b01(i). And we have already noted legislative history indicates these revisions were motivated by a desire to have the Kansas statute comply with Hall . Legislative Research Department Supplemental Note on Senate Bill No. 375 (testimony by Attorney General's office that bill to amend statute intended to respond to Hall ); see Hall , 134 S.Ct. at 1996 (majority cautioning that K.S.A. 2013 Supp. 76-12b01"could be interpreted to provide a bright-line cutoff leading to the same result that Florida mandates in its cases.").
The 2016 amendments demonstrate a legislative intent to have the statutory scheme for determining intellectual disability operate within Eighth Amendment parameters. Hall was clear in its cautioning language regarding the Kansas statute, and our Legislature acted promptly in response. And there is nothing in the legislative history to suggest an intention for legislative defiance of federal constitutional principles by keeping the more limiting definition regarding criminal capacity. We further note the Legislature did not have the benefit of Moore when it revised the statute.
Similarly, there is nothing to render the statutory scheme for determining intellectual disability inoperative by eliminating the phrase "to an extent which substantially impairs one's capacity to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law." Severing this portion of the sentence from the rest simply leaves the definition of intellectual disability to mean "having significantly subaverage general intellectual functioning, as defined by K.S.A. 76-12b01, and amendments thereto."
Finally, severance leaves intact an orderly and workable statutory framework for district courts to use when: (1) making the required findings; (2) ordering a defendant's examination; (3) appointing psychiatrists or psychologists to make assessments; (4) ensuring protection of the defendant's rights to present evidence and cross-examine witnesses; and (5) protecting defendants against self-incrimination by preventing use of statements made in court-ordered examinations in other proceedings. See K.S.A. 2016 Supp. 21-6622(c). The alternative would be to have the district courts fend for themselves in trying to apply the Eighth Amendment and risking inconsistent application of this important statutory scheme.
We hold the incapacity language is severable from the remainder of K.S.A. 2016 Supp. 21-6622(h).
We also must consider Thurber's argument that the statutory definition in K.S.A. 76-12b01(i) creates a bright-line rule that unconstitutionally prevents a court's consideration of adaptive functioning evidence. We disagree, although we acknowledge the 2016 amendments are not crystal clear as to what is encompassed when a death penalty defendant seeks to establish subaverage general intellectual functioning "by means in addition to standardized intellectual testing." L. 2016, ch. 108, § 1. Given that, we may consult legislative history to resolve a statutory ambiguity. See State v. Urban , 291 Kan. 214, 216, 239 P.3d 837 (2010) (noting court resorts to canons of statutory construction, legislative history, and other background considerations to construe Legislature's intent only when statute is unclear or ambiguous). And in doing so we again note the Legislature's intent in 2016 was to bring the statutory scheme into compliance with Hall .
*452 We hold the 2016 amendments-providing that the phrase "subaverage general intellectual functioning may be established by means in addition to standardized intellectual testing"-are sufficiently broad to allow compatibility with current medical community standards for making intellectual disability determinations, including consideration of deficits in adaptive functioning, as required by the Eighth Amendment. Moore, Hall, and Atkins all recognize in the death penalty context that states are constrained at least to some extent by the clinical definition of intellectual disability used in the medical community, i.e., states must be informed by-and cannot disregard-current medical community standards on this subject. See Moore , 137 S.Ct. at 1053 ; Hall , 134 S.Ct. at 2000 ; Atkins , 536 U.S. at 318, 122 S.Ct. 2242. Kansas is not exempt from this constraint, and the Legislature has shown its intent to have our statutory mechanisms comport with constitutional principles.
Accordingly, K.S.A. 2016 Supp. 76-12b01(i) should be understood for Eighth Amendment purposes in a manner compatible with federal caselaw. This means the statute's requirements are to be informed by-and cannot disregard-the clinical definition for intellectual disability currently used in the medical community, as recited in the caselaw, i.e., (1) significantly subaverage intellectual functioning that is indicated by an IQ score range taking into account the standard error of measurement; (2) deficits in adaptive functioning, i.e., the inability to learn basic skills and adjust behavior to changing circumstances; and (3) onset of these deficits during the developmental period. Moore , 137 S.Ct. at 1045 ; Hall , 134 S.Ct. at 1994 ; Atkins , 536 U.S. at 318, 122 S.Ct. 2242. This understanding reconciles Kansas and federal law.
We must decide next whether this court can simply compare current constitutional standards to the existing appellate record and decide whether the district court abused its discretion in making the threshold reason-to-believe finding in Thurber's case. The alternative is to return the case to the district court for the limited purpose of revisiting that determination based on the current law as we have described it. We conclude remand is necessary given the unique questions involved and the limited facts available to us as an appellate court. See State v. Neighbors , 299 Kan. 234, 240, 328 P.3d 1081 (2014) ("When an appellate court is presented with inadequate findings, the proper course [to take] depends on whether the issue was raised and can be resolved without remand."); State v. Raskie , 293 Kan. 906, 925-26, 269 P.3d 1268 (2012) (remanding due to inadequate findings on defendant's cruel and unusual punishment argument).
We hold that the interests of justice are not well served if we attempt to determine now whether the trial court erred based on the existing record given the changes to the law. We are also cognizant the parties may need to revise their previous arguments based on the changes to the statutes, developments in the caselaw, and this court's decision. And we further recognize a trial judge is in a superior position to make the factual findings necessary to decide if there is reason to believe Thurber was a person with an intellectual disability. See Backus , 295 Kan. at 1015, 287 P.3d 894.
On remand, the critical first issue for the district court will be how the evidence does (or does not) supply sufficient reason to believe Thurber was a person with an intellectually disability at the time of sentencing in March 2009. See K.S.A. 2016 Supp. 21-6622(a). To answer that initial inquiry, the district court must reexamine Thurber's motion based on the applicable caselaw, the current statutes, and the current diagnostic framework used by the medical community for determining intellectual disability. In doing so, as previously noted, the district court must disregard the statutory limitation in K.S.A. 2016 Supp. 21-6622(h) restricting the class of persons with intellectual disabilities to only those individuals whose significantly subaverage general intellectual functioning "substantially impairs [their] capacity to appreciate the criminality of [their] conduct or to conform [their] conduct to the requirements of law."
The district court may need to consider whether additional evidence is required or made relevant by the present federal constitutional *453 standards and state statutory revisions as we have interpreted them. But we emphasize remand is not necessarily to be seen as an opportunity to develop post-March 2009 facts in making the threshold reason-to-believe finding. That will be up to the district court as it considers what the law requires and what facts it needs to decide this question. We note Thurber's argument on appeal has consistently been that sufficient facts existed at the time of sentencing to find reason to believe he was a person with an intellectual disability. And we stress that what has changed since Thurber's 2009 trial is the law-not the facts upon which that law is to be applied.
If the district court finds sufficient reason to believe Thurber was a person with an intellectual disability in March 2009 when he raised the issue, it shall proceed as directed by K.S.A. 2016 Supp. 21-6622. The evidentiary universe from that point on will need to be determined by the district court in accordance with the statutory scheme and applicable caselaw.
23. Validity of Thurber's Death Sentence Under K.S.A. 21-4629
Thurber's Issue 23 claims that because K.S.A. 2016 Supp. 21-6622(h) or its predecessor is unconstitutional, the entire death penalty scheme is rendered invalid and requires revising his sentence to life imprisonment. He relies on K.S.A. 21-4629, which provides:
"In the event a sentence of death or any provision of this act authorizing such sentence is held to be unconstitutional by the supreme court of Kansas or the United States supreme court, the court having jurisdiction over a person previously sentenced shall cause such person to be brought before the court and shall modify the sentence and resentence the defendant as otherwise provided by law."
Thurber reads the phrase "any provision of this act authorizing such sentence" as encompassing the infirmities he has identified. "Interpretation of a sentencing statute is a legal question over which an appellate court has unlimited review." State v. Louis , 305 Kan. 453, 466, 384 P.3d 1 (2016). As discussed above, we have determined K.S.A. 2016 Supp. 21-6622(h) is unconstitutional as it pertains to the incapacity limitation so we must consider this claim more closely.
The State contends Thurber lacks standing because it claims the statutory definitions he complains about were never "directly applied" to him. But this argument has no merit. The statutes Thurber bases his argument on were specifically noted in the district court's analysis when it concluded there was no "reason to believe" he was intellectually disabled. The court referenced those statutes or quoted language from them in its ruling. See State v. Thompson , 221 Kan. 165, 172, 558 P.2d 1079 (1976) (noting generally "unconstitutional governmental action can only be challenged by a person directly affected").
Moving to the merits, a statute similar to K.S.A. 21-4629 was at issue in Hurst v. State , 202 So.3d 40 (Fla. 2016). In that case, the Florida Supreme Court addressed a death-sentenced appellant's argument that his sentence should be commuted to life imprisonment following a United States Supreme Court decision holding a portion of the Florida capital sentencing scheme was unconstitutional. The Florida court held its statute was intended to provide a " 'fail safe' " sentencing option if the death penalty-as a penalty-was declared categorically unconstitutional. And because the United States Supreme Court decision at issue only invalidated a portion of the process that permitted a judge rather than a jury to impose the death sentence, the statute did not automatically commute death sentences to life imprisonment without parole. Hurst , 202 So.3d at 63-66.
Like the Florida statute, K.S.A. 21-4629 operates as a fail-safe if either the death penalty as a penalty or a provision "authorizing such sentence" is deemed unconstitutional. The statutory definitions attacked by Thurber are not provisions "authorizing" a death sentence's imposition. They simply supply the statutory definitions for a court to determine intellectual disability. K.S.A. 21-4629 is inapplicable. Thurber is not entitled to have his death sentence automatically converted to a life sentence due to the constitutional *454 infirmity we determined existed in K.S.A. 2016 Supp. 21-6622(h) concerning the incapacity limitation.
CONCLUSION
We feel compelled to point out the problems we identify on the intellectual disability determination were not of the district court's making. That court was operating under now outdated state statutes and federal caselaw. And although the district court seems to have considered Thurber's evidence unimpeded by any barriers regarding IQ test scores or the capacity to appreciate the criminality of one's conduct, the court necessarily was applying an invalid statutory definition for "intellectual disability" when determining if Thurber can be executed. We have no choice but to reverse the district court's reason-to-believe determination and remand for reconsideration based on current constitutional parameters. See Hall , 134 S.Ct. at 1990 (framing question as whether Florida law created "an unacceptable risk that persons with intellectual disability will be executed").
We retain jurisdiction over the remainder of Thurber's penalty-phase appeal pending notification from the district court and the parties regarding the outcome on remand. See State v. Wright , 305 Kan. 1176, 1180, 390 P.3d 899 (2017) ("We therefore retain appellate jurisdiction, in the same manner that we retain it when we remand to district court for examination of an ineffective assistance of counsel claim under State v. Van Cleave , 239 Kan. 117, 120-21, 716 P.2d 580 [1986].").